PENNSYLVANIA CO. FOR INSURANCE ON LIVES AND GRANTING OF ANNUITIES v. HELVERING, Commissioner of Internal Revenue.

No. 5797.

Court of Appeals of the District of Columbia.

Argued June 9, 1933.

Decided June 26, 1933.

Edward B. Burling and Wm. Merrick Parker, both of Washington, D. C., for appellant.

G. A. Youngquist, Sewall Key, and A. H. Conner, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

The issue presented on this appeal is whether a bequest to the American Anti-Vivisection Society of Philadelphia is exempt from estate tax under the provisions of section 303 (a) (3) of the Revenue Act of 1924 (43 Stat. 253, 26 USCA § 1095 note). Petitioner is the executor of the estate of one A. Sydney Logan, deceased, who by last will bequeathed to the society a sum of money in excess of $200,000.

The applicable statute (section 303) provides: "For the purpose of the [estate] tax the value of the net estate shall be determined —(a) In the case of a resident, by deducting from the value of the gross estate— * * * (3) The amount of all bequests, * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual. * * *"

The Commissioner declined to allow the deduction, and the Board of Tax Appeals, one member dissenting, sustained his determination. If the society is a corporation organized and operated exclusively for a charitable purpose, the decision of the Board must be reversed, for it is admitted that no part of the net earnings of the society inures to the benefit of a private stockholder or individual.

It is stipulated the purpose of the society is the abolition of all vivisectional experiments on animals and other experiments of a painful nature. In its activities it gives rent-free the use of certain rooms to the Animal Rescue League and contributions to the expenses of that organization, which takes off the streets of Philadelphia animals which in some cases might find their way into vivisectional laboratories. It provides free lectures in its educational work against the cruelties of vivisection. It publishes a monthly magazine in which there is always some article in like manner exposing the cruelty of vivisectional experiments. It employs a man to watch the laboratories of the University of Pennsylvania to learn whether stolen dogs are delivered there for vivisectional purposes, and advises the owners so that the dogs may be reclaimed. The purpose of the society, as explained by its president, is to prevent cruel experiments on dumb beasts. "We try to keep them from falling into the hands of any vivisector to insure that they be kept out of the hands of those who would subject them to pain and suffering." He testified further that the term "vivisection," as understood by the society, means "experiments on animals from which cruelty results; * * * the cutting up of an animal alive, * * * and any kind of experiments upon animals involving pain, such, as for instance, inoculation of animals with some disease or drug which at the moment may be an inconsiderable pin prick but results, or is intended to result, in some form of disease under which the animal afterwards suffers." The publication of the society, among other things, records experiments made by various vivisectionists and calls attention to the pain and suffering thus inflicted on the animals experimented on. The purpose of this is to create public opinion against the practice. The members of the society believe that in this way they will encourage a universal spirit of humanity and kindness, and believe this humane spirit will be better developed by inculcating in the human mind abhorrence of the practice of inflicting pain and suffering on animals. They therefore contend the purpose of the society is charitable because its members honestly believe it will benefit mankind.

It is a matter of common knowledge that there are a large number of persons who oppose vivisection, and that societies for this purpose are established and exist in nearly all the states and in many European countries.

The problem, therefore, is whether such societies are charitable within the meaning of the act, and to find the answer we must look to established law to determine the meaning of the word "charitable." The question is not without difficulty, for there is no hard and fast rule applicable in all circumstances. The definition of a charitable trust or of a charity is variously stated to meet particular facts. Perhaps the best known of the definitions is that of Mr. Binney in the Girard will case. It is quoted with approval by Mr. Justice Swayne in Ould v. Washington Hospital, 95 U. S. 303, 309, 24 L. Ed. 450, and the opinion in that case points out the 21 charities included under the Statute of Elizabeth and that Mr. Justice Baldwin in examining the early English statutes and the early decisions of the courts of law and equity found 46 specifications of pious and charitable uses recognized as within the protection of the law. While the cases in this country in which charitable trusts have been upheld have been numerous, and have in nearly each instance been controlled by the particular facts, the great weight of opinion seems to be that a charita-

ble trust which is neither against public law nor public policy may be applied to almost anything that tends to promote the well-doing and well-being of social man. This is the definition given in Perry on Trusts at § 687.

In the English case In re Foveaux, 2 Ch. (1895) 501, Sir J. W. Chitty, one of the justices of the court of chancery, in discussing what is a charity under the Statute of Elizabeth, held that a charitable purpose must always be declared where the society or organization was one with a purpose tending to the benefit of a community, and he likewise observed that, in examining the purposes of any particular trust, courts take a liberal, rather than a narrow, view of the subject, and he illustrated this tendency by a quotation from Thornton v. Howe, 31 Beav. 14, in which Sir John Romilly upheld a trust for the publication of the works of Joanna Southcott, though he found in them much that was foolish, incoherent, and confused. The Foveaux Case involved the precise question here involved, and Mr. Justice Chitty, after reviewing a number of cases holding valid bequests for the benefit of birds and animals, including gifts to societies for the protection of animals liable to vivisection, summed up the result as follows:

"There is a balance of judicial opinion in favour of the defendant societies; there is no express authority against them. On principle, if a society for the prevention of cruelty to animals is a charitable society, it would seem to follow that an institution for the prevention of a particular form of cruelty to animals is also charitable. The mere infliction of pain is not necessarily cruelty; into the question of what is cruelty the moral element largely enters: Lewis v. Fermor, 18 Q. B. D. 532. It may be truly said that the infliction of justifiable pain is not cruelty. The question of what is and what is not justifiable is a question of morals, on which men's minds may reasonably differ and do in fact differ. Cruelty is degrading to man; and a society for the suppression of cruelty to the lower animals, whether domestic or not, has for its object, not merely the protection of the animals themselves, but the advancement of morals and education among men. The purpose of these societies, whether they are right or wrong in the opinions they hold, is charitable in the legal sense of the term. The intention is to benefit the community; whether, if they achieved their object, the community would, in fact, be benefited is a question on which I think the court is not required to express an opinion."

Armstrong v. Reeves (1890), Ir. L. R. 25 Eq. 325, 339–340, is another case in which a bequest to a society for abolition of vivisection was held valid as a bequest for a charitable purpose. The opinion there was given by the vice chancellor. He stated the object of the society as the total abolition of vivisection or putting animals to death by torture, and in the course of the opinion said:

"I am not called upon de novo to pronounce a decision as to whether the Society for the Abolition of Vivisection is a charitable institution or society; because, as I have said, it has been ruled already that it is; but certainly, if I had to consider the question for the first time, I should say it was within the legal definition of a charitable society. The statute of Elizabeth does not profess to enumerate all the different charitable purposes which come within its scope. It only gives some to be used as analogies; but in every case the court has to consider whether there is some public benefit to be derived from an institution, in order to determine whether its objects are fairly to be considered charitable or merely benevolent.

"Now, in the present case, I am of opinion that anything that tends to prevent the demoralization of public opinion which would be caused by an unauthorized or unnecessary practice of dissection of living animals, would be for the public benefit, as tending to correct and prevent cruelty or carelessness in reference to the sufferings of brute beasts. I do not mean to express any opinion—I really do not entertain any opinion—on the question of the total abolition of vivisection; but even if I differed in that respect from the objects of the society, which perhaps I might do as an individual, that is not the question. The question is, Whether the object in view is such as may fairly within the principles of decided cases, be deemed a charitable purpose. The cases I have referred to show that it is. I may also observe that there is a strong tendency in our law, both statute and common law, against the practice of cruelty to animals, and if vivisection be, as it must, a cruelty to animals, it can only be justified on the ground of being attended with beneficial public effects, of such importance as to render it desirable that the cruelty should be excused, in view of the public benefits to be derived from such investigations. If the members of this society honestly believe, as I have no doubt they do, that vivisection is a practice involving unnecessary cruelty to animals, I see nothing illegal in their desire to procure its abolition by enactment."

In New York state the surrogate of New York county held valid a bequest to the Vivisection Investigation League of New York State. And the Appellate Division of the Supreme Court of New York affirmed the decision. See In re Kendall's Estate, 133 Misc. 568, 233 N. Y. S. 319; Id., 227 App. Div. 778, 237 N. Y. S. 810. The contest in that suit involved the right of the society to an exemption from taxation of a bequest to the corporation. It was held that the corporation was a charitable corporation and the bequest exempt from transfer tax.

And in California, In re Estate of Florence A. Coleman, 167 Cal. 212, 138 P. 992, Ann. Cas. 1915C, 682, a bequest to the city of Sacramento to be used in erecting a suitable fountain for the benefit of thirsty animals and birds was held to be for a charitable use, and it was there said that gifts to benefit man through the medium of benefiting animals are good charities.

The Board of Tax Appeals was of opinion that vivisection was a practice beneficial to mankind, and that therefore a society whose purpose was to save animals from painful suffering and death and to educate public opinion against the practice was neither educational nor charitable.

There is nothing in the record by which we are able to determine the extent of the practice of vivisection, but we know, as the public at large knows, that it is practiced by men who are devoting their lives to scientific research in the control of human disease in a number of our large medical centers, and of that we take notice. To what extent it has been successful in developing the causes and prevention of disease we have only the layman's knowledge, but, as long as it continues to be advocated by institutions and societies unselfishly devoted to the common weal, it is safe to say the object of the antivivisectionists will be largely abortive, but to say that, because of this, their position is inimical rather than beneficial to society, would be to state a conclusion without justification. That the practice of cutting up live animals or of injecting deadly serum into their veins and then watching their excruciating agonies is repellant to the ordinary sense of humanity is undeniable. It is likewise cruel unless its justification be placed upon the theory of absolute necessity in the pursuit of science for man's welfare. As to this we need express no opinion. That there are honest differences on that subject must be conceded.

Nor is the fact that the society here in-

volved believes in the abolition of the practice conclusive of the question. Its object may be abolition, but in accomplishing that object its avowed purpose is by the creation of public opinion to avoid unnecessary pain and the cruel and unnecessary dissection of living animals. It is certainly in the public interests to correct and prevent the reckless or useless dissection of animals, for its unchecked and unrestrained practice inevitably will tend to brutalize and coarsen the human race. It is equally in the interest of society to prevent the larceny of privately owned dogs for the purpose of selling them at the kennels of institutes engaged in their dissection. It is equally in the interest of society that the subject itself and its legitimate objective should be discussed to the end that it may be determined, in the light of full discussion, whether the practice in its present form is necessary in the progress of medicine. These, we think, are charitable purposes as that term is generally construed by courts.

To sustain the decision of the Board in this case would involve our saying, as the Board said, that to abolish vivisection or to control and regulate it would be inimical to the public welfare and so to pronounce as destructive of the common good the efforts of large bodies of men and women in every state in the Union who unselfishly, even if mistakenly, believe the contrary. Congress did not include a definition of the term "charitable" as used in the act. In the absence of a definition, it is our duty to give the word its ordinary meaning. There is nothing in the act itself which would suggest that Congress had any other purpose than to exempt from estate tax funds bequeathed to those organizations recognized in the several states in which they exist as charitable organizations. Petitioner has the status of a charitable organization in the state of its incorporation. Its members believe they are engaged in promoting the well-being of social man. Certainly their work is unselfish, and equally certainly its purpose is humane. It may be the ultimate end they seek is unwise, but, even if we entertained that opinion, we should not be able to say that the things they do and intend to do in its pursuit are otherwise than in the public interest. That, we think, is enough to bring the gift within the definition of one for a charitable purpose, and, in that view, the Board's decision was wrong.

We are asked, however, to take judicial notice of the fact that the government itself approves the practice of vivisection in the

interest of the public health, and that experiments on living animals are made under governmental auspices. But this, if granted, does not mean that we must condemn as outlaws those of contrary view. The question is not so narrow as this. The test is rather whether in the manner of the pursuit of the object sought by those associated in the society some good to humanity may not result. Who can say it may not, for science is not changeless. That which is approved to-day is discarded to-morrow. The society believes that the ultimate good to humanity will be lost in the brutalizing effects of the practice, and they seek to educate public opinion to this view.

In their efforts to this end, they direct public attention to those experiments which are essentially brutal. This may lead to correctives without loss to science. Surely this is neither fantastic nor antisocial. Who can say that the propagation of these views will not result in general good, for only through the processes of debate and examination is truth made apparent. Since they are animated by a desire to advance the common weal, it must be conceded the object is charitable unless it violates a public law or a fixed custom having the effect of law. This is not the case here.

Reversed.