**B. B. MARGOLIS and Iris M. Margolis,**
**Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 18499, 18500.**

United States Court of Appeals
Ninth Circuit.

Sept. 11, 1964.

Rehearing Denied Nov. 30, 1964.
See 339 F.2d 537.

**1002**

Harrison Harkins, Parker, Milliken, Kohlmeier, Clark & O'Hara, Los Angeles, Cal., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Carolyn R. Just, Dept. of Justice, Washington, D. C., for respondent.

Before BARNES, MERRILL and DUNIWAY, Circuit Judges.

MERRILL, Circuit Judge.

These proceedings present for review the decision of the Tax Court, deter-mining income tax deficiencies for the taxable years 1955–1958.

During those years, taxpayer,[1] a resi-dent of San Diego, California, was active-ly engaged in the business of buying and selling real property. His petition pre-sents in a variety of circumstances the question whether property exchanged or sold by him at a gain had been held by him primarily for sale to customers in the ordinary course of his business.

With respect to this question, the transactions involved divide themselves roughly into three types.

First, those involving sale or exchange by the taxpayer of real estate to which he had legal title. As to these trans-actions taxpayer contends that the real estate was held by him as an investment, and not for sale to customers in the ordinary course of business; that he was entitled to nonrecognition of gain under Int.Rev.Code of 1954, § 1031(a),[2] (as to property exchanged), or to capital gain treatment under Int.Rev.Code of 1954, § 1221[3] (as to property sold).

Second, those involving sales of real estate held in trusts in which taxpayer had a beneficial interest. As to these transactions taxpayer contends that gain upon such sales constituted capital gain to the trusts and that he is entitled to like treatment of his distributions from the trusts.

Third, those involving sale by the tax-payer not of the real estate itself but of beneficial interests in trusts or corpora-tions which held real estate and of a note secured by real estate. As to these trans-actions the taxpayer contends that he was not in the business of selling such in-

1. This has reference to B. B. Margolis. His wife, Iris Margolis, was a passive party to the transactions in question.

2. "§ 1031. *Exchange of property held for productive use or investment*
"(a) Nonrecognition of gain or loss from exchange solely in kind.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including * * * property held primarily for sale * * *) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment."

3. "§ 1221. *Capital asset defined*
"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not in-clude—(1) * * * property held by the taxpayer primarily for sale to cus-tomers in the ordinary course of his trade or business * * *."

terests and that they were not held for sale; that he was, therefore, entitled to capital gain treatment under § 1221.

Commencing in 1936, taxpayer became active in rehabilitating distressed properties in the San Diego area, largely consisting of unimproved subdivisions. As a consequence he acquired ownership, or, with others, ownership interests in many subdivisions. From this start petitioner has substantially extended his real estate operations. The Tax Court in its opinion states:

> "For a long period of years petitioner has operated extensively in the real estate business in all its phases, and has engaged in over 4,000 real estate transactions. These transactions were undertaken in a variety of ways and his interests were held in many different forms. In a number of instances, trusts were created as a convenient means of holding real property pending sale and petitioner and his associates acquired beneficial interests therein in proportion to the amounts they contributed to acquire the property. In other instances the property was held by corporations in which petitioner owned stock, by partnerships of which petitioner was a member, and by petitioner individually. The real estate involved in his transactions ranged from individual lots to tracts containing several hundred acres, from raw acreage to unimproved and improved lots, from lots zoned for single or multiple residences to lots zoned for commercial usages, and from improved lots with residential dwellings to lots with business buildings. His dealings with respect to real estate have been of such comprehensive character, that he may properly be considered to be in the real estate business in all its aspects."

The transactions with which we are concerned in these proceedings were considered by the Tax Court in seven groupings.

1. *Exchanges of property title to which was in taxpayer.*

Taxpayer and his associates did not offer for sale all the lots in the subdivisions acquired by them. They retained some lots which they felt to be either commercial property or desirable residential view lots. Upon termination of a subdivision project they would apportion among themselves the retained lots. It is with lots so retained by taxpayer that these exchange transactions are concerned.[4]

The problem of distinguishing investment property from property held primarily for sale to customers in the ordinary course of business is not simple of solution under the circumstances here presented. As stated in Surrey & Warren, Federal Income Taxation, 690–691 (1960):

> "Where the taxpayer is an admitted dealer or trader in real estate, he may still, however, hold particular property as investment property not for sale. The problem here is thus one of identifying the character of the particular holdings, and naturally the difficulty is intensified by the

4. In September, 1955, petitioner consummated an exchange with U. S. Holding Company of San Diego, by which he transferred $26,000 in cash and four residential lots acquired in 1940 and 1942 and retained from two subdivisions in exchange for three-and-a-fraction lots improved with a residence. The property acquired has since been used by petitioner as his residence. The following year petitioner reacquired from U. S. Holding Company one of the transferred lots in exchange for cash plus a commercial lot.

In January, 1955, petitioner consummated an exchange with John M. Sachs, by which he transferred cash and seven lots located in San Diego in exchange for real property. Of the seven lots transferred four were commercial, three acquired in 1938 and one in 1946.

In August, 1957, petitioner consummated an exchange with Lilian Levikow, by which he transferred cash and four lots in San Diego County, three of which were commercial, in exchange solely for San Diego commercially zoned real estate.

**1004**

existence of other holdings as a dealer or trader."

In 3B Mertens, Law of Federal Income Taxation, § 22.139 (1958), it is stated:

"But a dealer in real estate may hold certain properties for investment rather than for resale, and accordingly it is necessary in each instance not only to show that the taxpayer is a 'dealer' in real estate but also that the property is primarily held for sale to customers in the ordinary course of the taxpayer's trade or business."

Taxpayer's contention upon the law is summed up in this statement from his brief:

"Petitioner considers raw acreage acquired to be held for appreciation as an investment property as contrasted with raw acreage ready for and acquired for subdivision purposes."

This position was rejected by the Tax Court. In its opinion it states:

"This Court has held that a person may be both a dealer and an investor with respect to his real estate holdings. * * * Where a person has been active as a dealer in the purchase and sale of real property, the burden is plainly upon him to establish that properties sold by him, particularly where they are non-income producing, were held for investment and not primarily for sale. * * * His mere testimony that his intent was to hold those properties for such a purpose may not be enough to sustain that burden where it is unsupported by other convincing evidence. * * * Moreover, the fact that he held some of them for many years prior to sale does not necessarily establish an intention to hold them for investment rather than sale."

And, later:

"It is quite apparent from [his] testimony that petitioner regards investment property as including property acquired and held for the purpose of resale whenever it appreciates in value to such an extent that a satisfactory profit can be realized. * * * But a real estate dealer who acquires and holds property with the intention of selling as soon as such a profit can be realized is holding it primarily for sale and not for investment."

And, later:

"The fact that he might have been able to sell some or even all of them at an earlier date is not inconsistent with a deliberate purpose to hold them for sale at a later time on more satisfactory terms. * * * That he may have intended to hold them until they appreciated sufficiently in value and carried out that intention does not detract from the fact that his essential purpose in holding them was ultimate sale at a profit."

■ We agree with the Tax Court. Where one is engaged in the business of buying and selling real estate on as broad a basis as was taxpayer, the fact that property was acquired with the intention of holding it for a substantial period of time before sale, is not sufficient to constitute it an investment.[5] If the purpose of the acquisition and holding and the only manner in which benefit was to be realized from the property acquired was ultimate sale at a profit, its acquisition and holding by a dealer such as taxpayer must be considered to have been for sale to customers in the ordinary course of business.

■ On the other hand, income-producing property (or property potentially of that character) held not for purposes of sale but in order that gain may be realized from the income produced by it, is properly regarded as investment.

■ The question as to these exchanges, then, is whether the record establishes that the purpose with which the taxpayer acquired and held the prop-

5. While the holding period is an important consideration it is not conclusive. Wine-berg v. Commissioner (9 Cir. 1963) 326 F.2d 157, 163

erties which were exchanged was the realization of gain from their ultimate sale. As to this the Tax Court has found:

"The evidence does not show that any of these lots were income producing or that petitioner held them with the intention of converting them into income-producing properties. Nor does it show that he was not holding them for disposition when the time was ripe. \* \* \* And when he had the opportunity to sell (or exchange) them for a consideration which assured him a satisfactory profit he took advantage of that opportunity."

The record amply supports this statement as to the residential lots. As to the lots retained for their commercial and industrial potential, however, petitioner's testimony was that he did not hold them for sale, but was primarily interested in converting them into income-producing properties. The record supports this. There is uncontradicted evidence that the petitioner, whenever possible, retained commercial lots from his subdivisions and would have kept all if he had been financially able to do so; that at the time of the exchange he had developed fifteen commercial lots into income-producing properties; that he had never sold either an improved commercial property or an unimproved commercial lot retained from a subdivision, despite many offers and opportunities to sell; that he had never put a "For Sale" sign on a commercial

lot owned by him, although he had put "For Lease" signs on several. Finally, the commercial properties here involved (in the Sachs and Levikow exchanges) were exchanged for properties zoned commercial or industrial which in turn were later rented or offered for lease by the petitioner rather than sold.

We conclude as to the commercial properties involved in the Sachs and Levikow exchanges that the findings of the Tax Court were clearly erroneous; that prior to exchange they were held by petitioner as investments and not for sale to customers; that gain realized upon the exchange of these, under § 1031(a), is not to be recognized.

2. *Sales of property title to which was in trust.*

Of the seven groups into which the transactions in question were divided by the Tax Court, four deal with transactions involving property legal title to which was held by trusts in which taxpayer held beneficial interests.

In the case of trust R-13316,[6] sale of the properties held by the trust was accomplished by the sale by the beneficiaries of their beneficial interests. As to this transaction taxpayer contends that since his gain was realized from the sale of such interest (which is personalty under the law of California) rather than from a sale of real property, and since he was not engaged in the business of selling such interests, he is entitled to capital gains treatment.

In the cases of trusts R-14066,[7]

6. Trust R-13316 was created January 3, 1952, to acquire 147.96 acres of undeveloped land in San Diego on which taxpayer and one other had an option. Prior to establishment of the trust taxpayer transferred his interest in the option to another. When the trust was established, however, the holders of a one-half interest were unable to meet their payment to the seller, and taxpayer took over their interest. Two parcels of property were sold by the trust during 1952 and 1953. In 1954, taxpayer received an offer to purchase 86 acres of the remaining property. Taxpayer and his associates then caused a transfer from trust R-13316 to trust R-14066 (see footnote

7) of the remaining 17.07 acres. The transfer of the 86 acres to its purchaser was accomplished not by deed of the trustee but by taxpayer and his associates transferring to the purchaser their beneficial interests in trust R-13316.

7. Trust R-14066 was created January 4, 1954, to receive the 17.07 acres transferred by taxpayer and his associates from trust R-13316. The trust declaration provides: "This trust is a passive trust only, and the sole duty of the trustee hereunder is to convey and transfer said real and personal property and to disburse any money upon order of the trustors hereunder \* \* \*." At the

S–275,[8] and 432,[9] property held by the trust for sale was sold by it, the proceeds were distributed to the beneficiaries, and taxpayer's shares were, in each case, reported by him as long-term capital gain upon the ground that such was the character of the gain in the hands of the trustee, since the trust was not in the business of buying and selling real estate.

In each case the Tax Court refused to accept taxpayer's reasoning and disregarded the existence of the trusts, stating:

> "The ultimate effect of the transaction was sale of land by the petitioner and his associates to the purchaser."

In our judgment the Tax Court was correct.

We quite agree with the taxpayer (on the basis of authority already quoted) that it should be possible for a real estate dealer to invest in corporations and other independent legal entities (such as trusts) which are engaged in the business of selling real estate without in every case attributing to the investor ownership of the assets of the entity in which he holds an interest.

We are not here faced with investment in an independent concern, however. Here, in each case, the trust was no more than a means by which the taxpayer could conveniently carry on his own business as to a specific piece of property: that of securing its acquisition and subsequent sale at a profit. In each case taxpayer appears not only as beneficiary but as trustor. In each case it appears that both acquisition and disposition of the property involved taxpayer's own exercise of judgment, and the same degree of control which he would have had had he held legal title. He was in each case doing, for personal profit, precisely what he was in the business of doing.

Under these circumstances in our judgment taxpayer's control from the outset over the manner and means of the holding of the property, his retained control over its ultimate sale and his reserved equitable ownership are sufficient to constitute a continuing holding for sale by taxpayer himself.

time the trust was established it was known that the State of California desired to acquire 10 acres of the property for freeway purposes, since the freeway route had been approved the preceding year. In September, 1955, the State completed condemnation of 10 acres and took title from the trust. Taxpayer's gain upon this share of the proceeds was reported as capital gain. On October 12, 1955, the remaining 7.07 acres was transferred back to taxpayer and his associates.

8. Trust S–275 was created June, 1948, to acquire 80 acres of land in the City of San Diego. Taxpayer had a 15-per-cent interest. The trust declaration recited that the trustors were establishing the trust "as a convenient means of selling and disposing of the described real estate and of handling all transactions in connection therewith." Taxpayer was named as sales agent, with the discretion to decide whether the property was to be sold as a unit or in parcels. Three parcels were sold from 1949 to 1956. At the time of the establishment of the trust 52.12 acres were being occupied by the Federal Housing Administration under an exclusive use order of court for which it was paying rent. Although the properties thus produced income, it had been the prospect of their appreciation in value which had induced their purchase by taxpayer and his associates. In 1956, Federal Housing Administration terminated its use, and in September, 1956, the property was sold and the proceeds distributed. Taxpayer's share of this distribution and of the proceeds of an earlier sale were reported as capital gains. Trust S–275 was still in existence at the time of the Tax Court hearing, holding one further parcel of land.

9. Trust 432 was created January 26, 1955, to acquire 44 acres in San Diego County on which taxpayer had an option to buy. Taxpayer had a 20-per-cent interest. The trust declaration recited that it was a "simple holding trust" and that "the trustors shall have possession, management and control of said property and of the income therefrom." On June 14, 1957, the property was sold to the State of California under threat of condemnation, and on that date the proceeds of sale were distributed and the trust closed. Taxpayer's gain was reported as capital gain.

The fact that the means by which the properties were held and sold by taxpayer were not those usually utilized by him in his business is not sufficient to place these transactions beyond the scope of taxpayer's "ordinary course of business." In that respect we are concerned with the nature and subject matter of the transaction rather than with the mechanics by which it was accomplished.

We conclude that the Tax Court was correct in holding that taxpayer's gains upon these transactions were ordinary income.

3. *Sale of property, title to which was in corporation.*

■ Murray Hills Estates, Inc., was created in 1950, for the purpose of acquiring and dealing in land. It remained dormant until October 14, 1954, when it was reactivated by taxpayer and one other associate for the purpose of receiving title to 104.7 acres of unimproved residential property in the City of La Mesa, San Diego County, for which it issued stock to taxpayer and his associate.

On March 26, 1955, taxpayer and his associate granted an option to Heartland Hills, a corporation, to buy all of the stock of Murray Hills Estates. Title to the property in question was transferred to Murray Hills twenty days later, April 15th. The option was exercised by Heartland and on August 25th the escrow holder transferred taxpayer's shares in Murray Hills to Heartland.

Taxpayer reported his gain on the transaction as long term capital gain in the sale of stock. The Tax Court ruled that it was in fact a sale of land with taxpayer's interest held for sale in the ordinary course of his business. It stated:

"The transaction here involved does not differ materially from that considered by this Court in S. Nicholas Jacobs, 21 T.C. 154 [165], affirmed, 244 [224] F.2d 142 [412] (C.A. 9). In that case the taxpayer, who had been engaged in the subdivision and sale of real estate for several years, reactivated a dormant corporation, conveyed land to it in exchange for its stock, and subsequently sold all of the stock for $175,000 to a newly formed corporation which was owned by a person desiring to purchase land. We found as a fact, and held, that these steps were component parts of a single transaction, by which the taxpayer effected a sale of land in the ordinary course of business. We also found as a fact that the corporation served no business purpose and performed no business function other than to act as a conduit to transfer the title to the land from the taxpayer to a purchaser of such real estate."

Other cases following the "step transaction" doctrine are Virginia W. Stettinus Dudley (1959) 32 T.C. 564, aff'd. per curiam (2 Cir. 1960) 279 F.2d 219; Willett v. Commissioner (6 Cir. 1960) 277 F.2d 586, cert. denied (1960) 364 U.S. 914, 81 S.Ct. 276, 5 L.Ed.2d 226. The rule is stated in 7 Mertens, Law of Federal Income Taxation, § 38.11 (Supp.), as follows:

"A corporation will be disregarded where, as part of a prearranged sale, property desired by a third party is transferred to it and then its stock is sold to the third party. In such case the price received for the stock represents, in substance, a profit from the sale of the property desired."

We agree with the Tax Court that this is an appropriate case for application of the step-transaction doctrine as recognized by this court in Jacobs. While at the time the corporation was reactivated and taxpayer formed his plan to transfer property to it taxpayer may not have contemplated any particular sale, this was not the case at the time the transfer to the corporation took place. The corporation then served simply as a conduit for the passing of title from taxpayer and his associate to Heartland Hills.

We conclude that the Tax Court was correct in treating taxpayer's gain on this transaction as ordinary income.

4. *Sale of (a) notes secured by property, and (b) right to share in gain realized upon sale of property.*

On April 9, 1953, Kearney Park Development Corporation entered into a contract to purchase certain unimproved real property in the City of San Diego, pursuant to which it subsequently took title. To cover a portion of the purchase price it gave two notes secured by trust deeds to the purchased property—one in the sum of $80,000 and a second in the sum of $553,750. The property was subject to the prior lien of improvement bonds for sewer and water connections. The property was located near the Miramar Naval Air Station. In August, 1955, newspapers publicized the fact that the Navy was proposing to enlarge the Miramar flight pattern and that additional land, including the Kearney Park property, would have to be acquired for this purpose.

In 1955, the notes were in default. Interest was delinquent. Improvement bond payments and property taxes were delinquent. The holder of the notes was in pressing need for funds, and under the circumstances was willing to dispose of the notes at a substantial discount. Taxpayer learned of these facts and secured options for the purchase of the notes.

In January, 1956, taxpayer, together with certain associates, purchased the $80,000 note for $30,000, with taxpayer taking a one-third interest. In February, 1956, the associates created trust 473, a "simple holding trust," and transferred the note and trust deed to it.

In May, 1956, taxpayer, with certain other associates, purchased the $553,750 note for $270,000, with taxpayer taking a one-fifth interest. On June 4, 1956, these associates created trust 482, and transferred the note and trust deed to it. The declaration of trust provided that trustors, representing at least 60 per cent of the ownership of the trust estate, could instruct the trustee as to disposition of the trust estate or enter into agreements with the owner of the real estate securing the note with reference to participation in any gain realized from the sale of the property.

On June 15, 1956, the associates, acting through the two trusts, entered into a new contract with Kearney Park, superseding the original purchase contract of April 9, 1953. By the new contract, the trusts agreed to postpone payment of the notes and to waive all past defaults. Further, they agreed to advance sums to Kearney Park sufficient to pay such installments due on bonds and taxes as would prevent foreclosure. It was agreed that on sale (or taking by the United States) of the property, proceeds or compensation would be disbursed: (1) to pay off the bonds and unpaid taxes; (2) to pay in full principal and interest due on the notes; (3) to reimburse the trusts for their advances on bonds and taxes; (4) to pay Kearney Park $150,000, the agreed amount of its investment; (5) to divide the balance equally between Kearney Park and the trusts. Rights of the trusts under this agreement to share in the gain on any sale or disposition of the property were secured by a further trust deed.

Funds for acquisition of the property by the Navy were released to the Navy in February, 1958. In March, 1958, an agreement to sell to the Navy was entered into by Kearney Park and the trusts. This sale was consummated the following month.

On April 1, 1958, before consummation of the sale, taxpayer sold to one of his associates in trust 482 all of his beneficial interest in both trusts at a substantial gain, but still for a sum substantially less than his share would have been of the proceeds of the sale to the Navy. It is the gain realized by taxpayer on this transaction which is at issue here. Taxpayer reported it as long-term capital gain. The Tax Court has treated it as ordinary income.

■ Taxpayer's beneficial interest in the trusts which he transferred at a profit represented two distinct rights on the part of the trusts: (1) A right to payment of principal and interest due on the

notes; (2) a right to share in any gain realized upon the sale of the real property. In our judgment the tax consequences of the realization of these rights are different, and the consequences of a sale of a beneficial interest in the rights differ accordingly.

(a) *As to the notes.* The Tax Court has refused to treat the notes as investments. It states:

"We have already noted the wide range encompassed by petitioner's real estate business, and we think that in the circumstances these notes occupied a status in relation to petitioner similar to real estate itself. He held his interest in them (whether by trust or otherwise) for the purpose of realizing a profit from their payment or from acquiring an interest in the land securing them, or both."

We cannot agree. The notes were secured at a substantial discount. By the agreement of June 15, 1956, they were to be paid in full as to principal and interest. By the time taxpayer disposed of his interests in the trusts, such payment was assured. The gain which such payment represented was not a gain in sale of real property, but a realization upon the notes. It was the extent of the discount at which the notes had been purchased which measured the profit to be realized and not the extent of any increase in the value of the security. Taxpayer was not in the business of acquiring notes at discount, and the notes were not held by him for sale to customers in the ordinary course of his business. The fact that the notes were secured by real property does not justify the conclusion that by virtue of the notes that property was held for sale, since the notes alone gave no right to share in any gain which might be realized upon the sale of the property.

We conclude that the notes were held as investments; that to the extent that taxpayer's share in the unpaid principal

of the notes (and interest due at the time of their acquisition) exceeded his acquisition basis, the sums received upon his disposition of his beneficial interest in the trusts constituted capital gain; to the extent of his share in interest on the notes, accrued subsequent to acquisition, the sums received by taxpayer constituted an assignment of income and were taxable as ordinary income. Fisher v. Commissioner (6 Cir. 1954) 209 F.2d 513, cert. denied (1954) 347 U.S. 1014, 74 S.Ct. 868, 98 L.Ed. 1136.

(b) *As to the right to share in the gain on sale of the property.*

By the agreement of June 15, 1956, the trusts acquired a new interest in the property—a right to share in any gain upon their sale.[10] This right, secured by a trust deed to the property, constituted an interest in the equity of the property itself, which interest in property was held for sale by the trusts.

For the reasons already discussed by us in dealing with the sales of property title to which was in trust (subdivision 2 of this opinion), it was proper to disregard the existence of these trusts and to construe the holding for sale as if it were by taxpayer himself and to construe his sale of his beneficial interests as a sale of property held for sale in the ordinary course of his business.

As to that portion of the sums received by taxpayer attributable to his share in the gain upon sale of the real estate and interest accruing after his acquisition of the notes we agree with the Tax Court that it was ordinary income to the taxpayer.

As to the exchanges by taxpayer of commercial and industrial property and as to the sale of taxpayer's interests in trusts 473 and 482 (to the extent hereinbefore specified), the judgment of the Tax Court is reversed and this matter is remanded for further hearings in accordance with the views here expressed. In all other respects judgment of the Tax Court is affirmed.

---

10. At the time trust 482 was established, at least, it was anticipated that such right might be acquired, as the language of the trust declaration makes clear.