James F. JOHNSON and Mabel I. Johnson, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Civ. A. 10434.

United States District Court
N. D. New York.

Nov. 10, 1967.

Smith, Pattison, Sampson & Jones, Troy, N. Y., for plaintiffs; Lambert L. Ginsberg, Troy, N. Y., of counsel.

Justin J. Mahoney, U. S. Atty., for the Northern Dist. of New York, Albany, N. Y., for defendant; Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C., Michael E. Marr, Sp. Atty., Dept. of Justice, Washington, D. C., of counsel.

## OPINION

McLEAN, District Judge.*

This is an action pursuant to 28 U.S.C. § 1346(a) for refund of income taxes allegedly erroneously and illegally assessed against and collected from plaintiffs for the year 1957. Plaintiffs paid the assessment, under protest, on July 1, 1960, filed a claim for refund, and upon a disallowance of that claim, began this action. It is undisputed that the filing of the claim and the institution of suit were timely.

The action involves two wholly unrelated questions: (1) whether a gift made by plaintiffs to the Dunham Hollow West Stephentown Community Association was properly deductible as a charitable contribution, and (2) whether profits made by plaintiffs upon the sale of certain parcels of real estate were capital gains or ordinary income. The two questions will be separately treated in this opinon.

*The Gift to the Dunham Hollow West Stephentown Community Association*

I find the facts to be as follows.

West Stephentown, New York, is a rural community in southern Rensselaer

County. Some of its residents commute to Troy. Others are local farmers and laborers. Some residents have a reasonably adequate income, others are very poor. Many of them, prosperous and poor alike, have children.

In 1954 a group of these residents, including plaintiffs' son-in-law, conceived the idea of organizing an association to educate and assist the children of the area in various ways. They formed the Dunham Hollow West Stephentown Community Association which at first was an unincorporated association, somewhat loosely put together, but with elected officers. On October 12, 1956 the association was formally incorporated as a non-profit membership corporation under the laws of the State of New York.

All the children of the community, whether their parents were members of the association or not, were eligible to participate in the association's activities. No charge was made for that participation. The association was supported by voluntary donations made by the more affluent members. No officer of the association received any compensation.

The association's activities began in a modest way in 1954 and gradually increased over the years to 1957 and thereafter. These activities included organized athletics, instruction in camping, woodcraft and archery, and instruction in sewing and homemaking for the girls. The association also conducted 4–H Club programs. It offered some pre-school instruction for the younger children. It maintained a small library formed of books donated by members. The children were taken on trips to museums in nearby cities. Lectures were given to them on various educational topics by members of the faculty of Rensselaer Polytechnic Institute in Troy. There were also lectures on current events. The instructors and lecturers made no charge for their services.[1]

* Sitting by designation.

1. In 1960, subsequent to the period relevant here, more ambitious educational programs were undertaken which were financed with aid obtained from the State of New York.

The association was a distinct success. Most of the children of the community participated and derived substantial benefit from the various programs. The association was handicapped, however, by lack of a building of its own. Meetings had to be held in the homes of members or for a time in a rented schoolhouse. The need for an adequate physical plant was particularly apparent in the winter months.

Plaintiff James F. Johnson was born in West Stephentown, although he has lived for many years in Troy. He was interested in the work that the association was doing to help the children of his native community. In 1956 he told the officers of the association that he was disposed to donate a piece of land and some building materials to the association if the members would erect a building to constitute the association's headquarters.

This project was enthusiastically received and carried out. Many residents, young and old, pitched in and constructed a building. Masons and carpenters donated their services. The older children helped in the construction work, without pay.

Construction started in the fall of 1956 and was completed by the spring of 1957. Thereafter on July 16, 1957, plaintiffs executed a deed to the land and delivered it to the Dunham Hollow West Stephentown Community Association, Inc., the membership corporation, which, by resolution of its board of directors dated July 15, 1957, accepted the deed. Plaintiffs received no consideration for the transfer. It is stipulated that the value of the land and the miscellaneous building materials given by plaintiffs to the association was $2,018.50.[2]

■ I conclude that the Dunham Hollow West Stephentown Community Association, Inc. was a charitable corporation within the meaning of 26 U.S.C. § 170(c) (2) (B). Cf. Mustard v. United States, 155 F.Supp. 325, 140 Ct. Cl. 205 (1957); Pennsylvania Co. etc., v. Helvering, 62 App.D.C. 254, 66 F.2d 284 (D.C. Cir. 1933).

■ No part of the corporation's earnings inures to the benefit of any private stockholder or individual. It does not carry on propaganda or otherwise attempt to influence legislation. A gift to this corporation is therefore deductible.

■ Defendant contends that plaintiffs selected the wrong year in which to claim this deduction and that they should have claimed it in 1956. I reject this contention. I find and conclude that the gift was made on July 16, 1957 when the deed to the land was delivered. Although by that time the building had already been erected on the land, it belonged to plaintiffs until they delivered the deed. The fact that Johnson had previously indicated his willingness to make a gift does not alter the fact that he actually made it in 1957.

I conclude that plaintiffs were entitled to a deduction of $2,018.50 in computing their taxable income for 1957. Defendant's disallowance of this deduction was therefore illegal and erroneous.

*The Real Estate Transactions*

I find the facts to be as follows.

Plaintiff James F. Johnson has been a real estate broker in Troy for forty-eight years. As a broker he has brought about the sale of many properties, the great majority of which have been residential, rather than commercial. Also in the years prior to 1957, he has on occasion acquired certain properties for his own account which he has subsequently sold. The evidence discloses seven such transactions in the years 1954, 1955 and 1956.

One of these, the Tifft transaction, involved the sale to a neighbor of land which Johnson had owned for over twenty years. This is different in character

2. This is the figure set forth in the stipulation as reported in the transcript (pp. 17, 18). The figure in the complaint (Paragraph 8) is $2,118.15. If the figure in the transcript is a typographical error, I assume that the parties will be able to agree to correct it before the judgment is entered.

from the others. As to the other six, although Johnson's testimony concerning them was not entirely lucid, it sufficiently appears that it was through his activities as a real estate broker that Johnson first learned of the availability of these properties which he eventually purchased and resold. The properties in each instance, with perhaps one exception, were residential houses.

In two instances, Johnson purchased from a client a house which he had previously attempted, without success, to sell for that client. In one case, he purchased the property from a client when the buyer whom he had previously procured defaulted on his agreement to purchase it. In two instances Johnson as a broker sold property for a client and in order to facilitate the sale, he lent money to the buyer and took a mortgage to secure the loan. When the buyer eventually failed to pay the mortgage, Johnson acquired the property through foreclosure. In one case the buyer of the property, whether a client or not does not appear, "bought it and couldn't go through with it." Johnson thereupon bought the house, repaired it and later resold it.

On the Tifft transaction, Johnson made a profit of $2,012. As to the other six, he sustained a loss on two, and a small profit, in no case more than approximately $2,000, on the other four. He treated all these transactions as capital transactions in his income tax returns, without challenge from the Internal Revenue Service.

In the year 1957, the year with which we are concerned in this case, there were three more similar transactions. One resulted in a profit of $354.92. The other two resulted in losses of $282.47 and $605.77 respectively. Plaintiffs treated these as capital transactions and reported them on Schedule D of their 1957 income tax return. The profit of $354.92 was reported as a short-term gain. The other two were reported as long-term losses.

The nature of these three transactions was briefly as follows. The one

that resulted in a small profit was another case in which Johnson lent money to the purchaser of a client's house in order to facilitate the sale, the buyer eventually defaulted on his mortgage to Johnson, who thereupon took over the property and a short time later resold it. The transaction in which Johnson suffered a loss of $282.47 involved a house which Johnson was unable to sell for a client. He bought it himself and later resold it. The third transaction, involving in this instance a farm, is still another case in which Johnson acquired the property in order to protect his interest as mortgagee. He resold it within a little more than a year.

The evidence discloses several transactions in the years subsequent to 1957. For the most part, these fall into the same pattern. They need not be discussed in detail here for they do not affect the conclusions set forth hereinafter.

I turn now to the transactions in 1957 which are of primary importance on this branch of the case, those involving the so-called Kalbfleish tract. In 1946 a farmer named Adam Kalbfleish listed with Johnson, as a broker, a large tract of farm land which he wished to sell. The tract comprised 31.6 acres. It was located in Albany County, a few miles from Troy, on the highway to Schenectady, near what has since become known as Latham Circle. At that time the area was largely rural. Johnson was unable to find a buyer for the property. Kalbfleish was anxious to sell. Finally in 1946 Johnson and a man named Weed who at that time was a broker in Johnson's office, jointly purchased the property from Kalbfleish and took title to it as tenants in common.

Johnson's intention at that time was to hold the land as an investment. He believed that eventually it would appreciate in value. He regarded it as a nest egg for his old age, and he also had some thought that some day he might give it to his daughter.

Nothing happened with regard to this property from 1946 to 1954. Johnson

had no desire to sell it and made no effort to do so. Meanwhile, the area began to develop. New houses were built in the vicinity. Real estate values moved sharply upward.

In 1954 Weed, who by then was no longer associated with Johnson in the real estate brokerage business, informed Johnson that a gasoline and oil company wished to buy a small piece of the Kalbfleish tract, facing on the highway, with a view to erecting a filling station on it. Johnson was reluctant to sell, but Weed was eager to do so. Johnson finally agreed. In December 1964 Johnson and Weed sold a parcel the dimensions of which were 150 feet by 150 feet, to the Cities Service Oil Company.

In late 1956 Weed again came to Johnson and informed him that another gasoline and oil company, Esso Standard Oil Company, wished to buy a piece of the tract adjacent to that previously sold to Cities Service Oil Co. as a site for another filling station. Although again expressing reluctance to sell, Johnson agreed to do so and in January 1957 he and Weed conveyed a 150 foot by 150 foot parcel to Esso.

Shortly thereafter Weed informed Johnson that Staffordshire Realty Corp. wished to buy a larger portion of the Kalbfleish tract, containing approximately six acres, fronting on the highway, as a site for a bowling alley. There was an impediment to this proposed purchase due to the fact that the area which Staffordshire desired to buy included a small lot which Kalbfleish, back in 1939, long before he sold the main tract to Johnson and Weed, had sold to a man named Carroll. Johnson and Weed solved this problem by purchasing this lot from Carroll in March 1957. They then sold the six acres, including this lot, to Staffordshire in April 1957.

Before the sale was consummated, Johnson and Weed had some grading done on this parcel by a bulldozer which they hired and the cost of which they shared. Apparently this was something that Staffordshire wanted done. The extent of this work does not appear.

There were no further transactions with respect to the Kalbfleish tract in 1957. Subsequently in 1961 Johnson and Weed sold the balance of the property, then consisting of approximately 26 acres, to Tinda Realty Company.

Johnson and Weed, being tenants in common, shared the profits of these transactions equally. Johnson's share of the profits realized upon the sale of the parcels which were sold in 1957 amounted to $16,878.54.[3]

At no time did Johnson personally solicit purchasers for these various portions of the Kalbfleish tract. He did not personally deal with the prospective purchasers of the parcels in question. He did not advertise the tract as being for sale. He did, however, participate in the purchase of the small lot from Carroll which was necessary in order to consummate the sale to Staffordshire.

Weed, however, was more active. After he left Johnson's employ shortly after 1946, he opened his own real estate brokerage office, in Latham, near the Kalbfleish tract. Undoubtedly he was familiar with the rapid rise in real estate prices in that area. He dealt with the prospective purchasers of the parcels in question. Two of them, Esso in 1956 and Tinda Realty Company in 1961, seem to have initiated the contact with Weed, but Weed was entirely willing to comply with their desires.

Weed apparently was anxious to realize upon the opportunity for substantial profit which the Kalbfleish tract pre-

3. Although the record is not clear, this figure seems to have been computed by taking the difference between the 1946 cost of the parcels sold to Esso and Staffordshire and the 1957 selling price of those parcels. The profit realized upon the small piece purchased from Carroll in 1957 and shortly thereafter included in the parcel sold to Staffordshire in 1957 does not seem to have been taken into account. Apparently plaintiffs treated their share of this profit as ordinary income, not capital gain, but it is impossible to be sure of this from the face of the tax return or from the testimony.

sented. Johnson was not in need of cash and he was not eager to sell. Nevertheless, he acceded to Weed's entreaties. When asked why, he testified, "Just to cooperate, I guess."

Johnson considers himself to be a real estate broker. He does not regard himself as being in the business of buying and selling real estate for his own account.[4] The Kalbfleish tract, however, was carried on Johnson's accounting records as part of "Inventory," at least since January 1, 1958.

■ The definition of "capital asset" in 26 U.S.C. § 1221(1) excludes "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The question to be determined here is whether the parcels of real estate listed by plaintiffs as capital assets on Schedule D of their 1957 income tax return were such property.

Johnson was primarily a real estate broker. But it is clear that over the years from time to time he bought or acquired pieces of real estate, usually residential properties, which he subsequently resold at a small gain or loss, usually after holding them for a relatively brief period, a year or two at most. In a sense, this was a side line with him. He did this as an adjunct to his brokerage business. The properties were usually those which he had sold or attempted to sell for his brokerage clients. It is true that the financial results of these activities were almost nominal. But Johnson did not do this as a hobby, or out of charity. To be sure there were times when his willingness to lay out his own money in order to complete a transaction was of material benefit to his client. Doubtless this increased the good will which he enjoyed as a broker. But the fact remains that these were essentially business transactions. There is no claim that Johnson intended to occupy these houses himself, or that he intended to keep them as a long-term investment. To a limited extent, as a supplement to his business of buying and selling real estate for others, he bought and sold real estate for himself.

The transactions reported in Schedule D, other than the parcels of the Kalbfleish tract, were typical of this course of conduct. They involved properties which Johnson held "primarily for sale to customers in the ordinary course" of his business. The properties were not capital assets within the meaning of Section 1221(1). Defendant correctly disallowed, as to them, the capital gains treatment claimed in the return.

■■ It does not inevitably follow, however, that the Kalbfleish tract also was not a capital asset. A man may be in the business of buying and selling real estate and still hold a particular piece of real property for investment rather than for sale in the course of his business. Emilio Olivieri, 25 CCH Tax Ct.Mem. 920 (1966); see F. B. Tippins, Jr., 24 CCH Tax Ct.Mem. 521 (1965). Whether or not the Kalbfleish tract was held by Johnson primarily for sale to customers in the ordinary course of his real estate business is a question of fact. There are many factors to be considered. See Gault v. Commissioner of Internal Revenue, 332 F.2d 94, 96 (2d Cir. 1964). I have considered them all.

There is a marked difference between Johnson's dealings with this tract of vacant land and his purchases and sales of residential properties which I have found that he held for sale in the course of his business. When Johnson acquired a one-half interest in the Kalbfleish tract in 1946, he had no intention of selling it in the foreseeable future. He intended

---

4. In an affidavit prepared for Johnson's signature by somebody else in connection with an appraisal of certain property in 1964, Johnson stated that he had "been in the business of buying, selling, leasing and appraising real estate in the Counties of Albany and Rensselaer, and adjoining counties, for upwards of thirty years last past * * *." Since in the preceding sentence of this affidavit he stated that he was a real estate broker, it is not clear whether or not, in the sentence quoted, he was attempting to distinguish between his activities as a broker and transactions for his own account.

to hold it as a long-term investment for himself or his daughter. He did hold it intact for eight years. Throughout that time he made no effort to sell it. He did not advertise it for sale.

▓ The time came when Johnson did sell three portions of the tract, one in 1954 and two in 1957. The mere fact that he sold these parcels does not, in and of itself, require the conclusion that he was no longer holding the property for investment. A man may realize upon his investment without subjecting himself to liability for income taxes on the profit at ordinary income rates.

It is clear that the initiative in these three sales came from Weed. The prospective buyers dealt with him, not with Johnson. Weed urged Johnson to sell. It is true that Johnson, with whatever reluctance, accepted Weed's suggestion. But it is nevertheless significant in determining Johnson's intent, that it was not he who promoted the sales.

If Johnson had sold the entire tract, at Weed's insistence, in 1957, I would have no doubt that he would be entitled to capital gains treatment for income tax purposes. How much is the situation changed, if at all, by the fact that he did not sell it all at once? After careful consideration, I conclude that this factual difference does not require a difference in legal result. This is not a case in which, as in *Gault,* the taxpayer improved his land, surveyed it, laid out roads and divided it into lots. There is even less in the way of fragmentation of the property here than there was in Austin v. Commissioner of Internal Revenue, 263 F.2d 460 (9th Cir. 1959), in which the court held in favor of the taxpayer, reversing the Tax Court's decision to the contrary as clearly erroneous. See also Voss v. United States, 329 F. 2d 164 (7th Cir. 1964). The grading work done on the tract sold to Staffordshire, whatever it may have been, appears to have related only to that particular parcel and that particular sale. It was not a general improvement of the entire property, as in *Gault.* It does not

appear that this grading work substantially enhanced the value of the parcel.

Neither side has referred to 26 U.S.C. § 1237 which, in substance, provides that, when certain conditions are present, a tract of land shall not be deemed to be held primarily for sale to customers in the ordinary course of business of the taxpayer "solely because of the taxpayer having subdivided such tract for purposes of sale." That section would seem to be applicable here. In any event, I reach the same result on this aspect of the case without regard to this statute.

In Margolis v. Commissioner of Internal Revenue, 337 F.2d 1001 (9th Cir. 1964), relied upon by defendant, the court said (337 F.2d at 1004):

"If the purpose of the acquisition and holding and the only manner in which benefit was to be realized from the property acquired was ultimate sale at a profit, its acquisition and holding by a dealer such as taxpayer must be considered to have been for sale to customers in the ordinary course of business."

If by this statement the court intended to set up a single test, without regard to the various other factors mentioned in *Gault,* it would appear to be contrary to the rule followed in this circuit which *Gault* exemplifies. In any event, the *Margolis* test is not controlling here, for it cannot fairly be said that when Johnson acquired his interest in the property, his sole purpose was its ultimate sale at a profit. His intentions were not as specific as that, either at that time or for years thereafter.

I do not minimize the fact that Johnson is a dealer in real estate or that he listed this tract, at least after January 1, 1958, as part of his "Inventory." These facts, of course, weigh in defendant's favor. They are outweighed, in my opinion, by the other evidence which I have related.

▓ On balance, I find and conclude that the portions of the Kalbfleish tract sold by Johnson in 1957 were not held by him primarily for sale to customers

in the ordinary course of his trade or business within the meaning of 26 U.S.C. § 1221(1). These parcels were capital assets. It follows that in denying capital gains treatment and in assessing and collecting a tax upon the theory that the profits from the sale of these parcels constituted ordinary income, defendant acted illegally and erroneously.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Plaintiffs are entitled to judgment in accordance with this opinion. I have not attempted to compute the amount of the judgment. Presumably the parties will be able to agree upon the arithmetic. In the event that they fail to do so, any questions in this regard may be referred to me for determination before judgment is entered.

So ordered.