**OLD COLONY TRUST CO. v. WELCH,**
**Former Collector of Internal**
**Revenue.**
**No. 6913.**

District Court, D. Massachusetts.
Oct. 18, 1938.

Sumner H. Babcock and Bingham, Dana & Gould, all of Boston, Mass., for plaintiff.

John A. Canavan, U. S. Atty., and C. Keefe Hurley, Asst. U. S. Atty., both of Boston, Mass., for defendant.

FORD, District Judge.

This is an action brought to recover Federal Estate Taxes assessed against the plaintiff as executor of the will of Philip G. Peabody. The right to trial by jury being waived, the case was heard without a jury. The question involved herein is whether bequests to the New England Anti-Vivisection Society and the Free-thinkers of America, Inc., were exempt from estate taxes under the provisions of Section 303(a) (3) of the Revenue Act of 1926, 44 Stat. 72, as amended by Section 807 of the Revenue Act of 1932, 47 Stat. 282, 26 U.S.C.A. § 412(d), which reads as follows:

"For the purpose of the tax the value of the net estate shall be determined—

"(a) In the case of a resident, by deducting from the value of the gross estate * * *

"(3) The amount of all bequests, legacies, devises, or transfers * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including * · * · * the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual * * *."

The special findings of fact required by Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, which include and adopt those contained in the agreed statement of facts filed by the parties are as follows:

Philip G. Peabody, died a citizen of the United States and a resident of Boston, Massachusetts, on February 25, 1934, and the plaintiff was duly appointed executor of this will on October 30, 1934. The will provided that the residue of the estate was to be distributed in equal shares to the Massachusetts Society for Prevention of Cruelty to Animals, the New England Anti-Vivisection Society, and the Free-thinkers of America, Inc. As a result of a compromise of this will each society was allotted the sum of $38,974.20. A deduction was allowed as to the share of the Massachusetts Society for the Prevention of Cruelty to Animals. On July 17, 1935 the Commissioner of Internal Revenue refused to allow the deductions in reference to the New England Anti-Vivisection Society and the Freethinkers of America, Inc., stating that "no deduction is made for the charitable, public, and similar gifts and bequests for the reason that from the evidence submitted as to the purposes and activities of the organizations in question, it appears that a substantial part of their activities is carrying on propaganda or otherwise attempting to influence legislation."

The reason assigned was based upon Section 406 of the Revenue Act of 1934, 48 Stat. 755, to which the Commissioner made reference, and which it is agreed between the parties to this suit is not applicable in view of the date of the testator's death on February 25, 1934, the effective date of the amendment being May 10, 1934. It was agreed for the purposes of this case that the 1934 Amendment had no retroactive effect.

The New England Anti-Vivisection Society is a Massachusetts corporation organized in 1895 and the testator was a charter member. Its charter states that it was organized for the purpose of systematic, scientific research relative to the practice of vivisection—its relation to science and its effect upon those who practice it and upon society; exposing and opposing secret or painful experiments upon living animals, lunatics, paupers, or criminals; urging education and legislation in pursuance of these ends; and issuing

posters, pamphlets and other publications. This society published a monthly magazine called "Living Tissue" and had an office at 6 Park Street, Boston, where there were only three persons employed, an executive secretary, her assistant, and an investigator of laboratories, who received approximately salaries totalling $5,600 annually. There were 1,800 members in this society and they were divided into four classes of membership—honorary, life, active, and associate. Associate members paid $1 per year; active members paid $5 per year; and life members paid $100. The only sources of income were from members, bequests, and scattered donations. The monies received were invested and this furnished additional income all of which was expended for the up-keep of the offices at 6 Park Street, posters in the display window of the same, leaflets, publications of the magazine, and for salaries of the three paid employees. No part of the net earnings of the society inured to the benefit of any private stockholder or individual. It was listed as a charitable organization in Massachusetts and paid no taxes. All of its activities were in the direction of the humane education of the public. Its publication "Living Tissue" was devoted to the exposition of vivisection experiments performed upon animals and it described therein the cutting of living animals with knives, the effect of this treatment upon them and the effect of all of this upon those who practiced it and upon society in general. Radio talks were given informing the public of the extent and nature of vivisection, as their investigator found it in the medical laboratories and there was exposition of the various methods as to how the animals were supplied to the laboratories by those who purloined them from their owners. All the subjects dealt with in the pamphlets and radio talks concerned vivisection and cruelty to animals, and were related to the objects and purposes for which the organization was formed as described in the charter. It was one of the primary purposes of the society to create public opinion against vivisection. Lectures were given before various organizations for this purpose. This society sought for its aim in exposing the cruelties attendant upon animals in vivisection to inculcate a feeling of human sympathy, kindness, and a sense of justice on the public mind and in this manner benefit mankind in general. It also appeared that between the years 1917 and 1933 the society sponsored three bills in the Massachusetts Legislature asking that dogs be exempt from the practice of vivisection.

■ It is a matter of common knowledge that a very substantial part of the general public oppose vivisection and that in vivisection there is present pain and suffering and the infliction of pain on the unwilling, whether man or beast, is cruelty.

The Freethinkers of America, Inc., is a New York corporation, which was incorporated in 1929, and its charter declares that the purposes or objects for which it was organized were as follows, viz: "To enlighten all people upon the philosophy of free thought and by all legal means to uphold the fundamental American principle of the complete separation of church and state."

Its membership was composed of regular, contributing, supporting, sustaining, and executive members paying varied annual amounts into the organization for the right to membership. No part of its net earnings inured to the benefit of any private stockholder or individual.

It stated in a pamphlet, an exhibit in the case, issued by the corporation entitled "Aims and Principles of the Freethinkers of America" as it did also in its publication called the "Bulletin" that "Freethought declares that theology is condemned by reason as superstitious, and by experience as mischievous, and assails it as the historic enemy of progress."

And the organization demanded "that no religious instruction be given or religious observance be held in schools supported in whole or in part by taxation; * * * that all religious services now sustained by the government shall be abolished; and especially that the use of the Bible in the public schools * * * shall be abolished; that all laws directly or indirectly enforcing the observance of Sunday as the Sabbath shall be repealed."

It states as one of its principles that free thought "knows nothing of divine guidance or interference" and that "religion has ever been the foe of man's social, moral, and intellectual advancement."

As far as the documentary evidence introduced as to this society showed, its activities in part consisted of meetings of its own members some of which were ad-

48

dressed by those discussing the aims and the purposes of the organization stated above, news letters sent to its members, luncheon and theatre parties of its members, and the publication of the "Bulletin" sent to the members of the organization which was devoted to spreading information concerning its achievements and activities. Its income was derived from membership dues, bequests, and donations, which was devoted to the general purposes of the organization. At times it appeared in opposition to legislation which the organization maintained was unconstitutional.

The chief activity of this organization was its appearance, through its representatives, in the New York Courts between the years 1930 and 1937, where it sought through litigation to accomplish the aims of the organization. No evidence was presented as to its activities beyond this date. In fact, no evidence beyond the agreed statement of facts and pamphlets and letters agreed upon as exhibits was introduced. This litigation involved the following subjects: the exclusion of the use of the Bible in the Public Schools of New York; the elimination of religiously controlled societies from the public schools; a suit to restrain the Board of Education from spending public monies for Bibles; a suit against the St. Paul's Chapter of Trinity Church for printing and selling an allegedly forged Washington's prayer; a suit seeking to tax the Knights of Columbus Hotel Building in New York; one involving the ruling of the New York City Department of Public Welfare in apportioning foundlings for adoption; a suit to prohibit free transportation for parochial school children; a suit to force the resignation of a school principal who is alleged to have attempted to coerce children in receiving religious instruction.

The organization's funds were used to the point of depletion to conduct these "legal battles," as it called them, and participation in litigation of the nature outlined above constituted a major part of the activities of the corporation. The resources of the organization were drained to defray the expense of these suits, according to the statements of its representatives, and frequent special appeals for funds from the members were made to meet the legal expenses incurred in the prosecution of the suits mentioned above.

In the following conclusions of law each organization is dealt with separately.

It is the contention of the plaintiff that the New England Anti-Vivisection Society is a charitable organization organized and operated exclusively for charitable purposes within the meaning of the Revenue Act of 1926 as amended by the Revenue Act of 1932, the applicable provisions of which are quoted above.

The commonly understood and narrow meaning of the word "charity" is goodwill to the poor and suffering, almsgiving, and provision for the care or relief of the poor. (Webster's International Dictionary, 2nd Ed.). In the law, however, a far broader and more comprehensive significance has been given to the word "charitable" in this country for more than a century past, Vidal et al. v. Girard's, Exec., 2 How. 127, 11 L.Ed. 205, and probably in England long before the passage of the Statute of 43d Elizabeth Ch. 4.

The case of Little v. Newburyport, 210 Mass. 414, 417, 96 N.E. 1032, Ann.Cas.1912 D, 425, in holding that the Young Men's Christian Association was a charitable institution because of the fact that it promoted the moral, mental, and physical welfare of young men stated that "Charity in the legal sense 'is not confined to mere almsgiving or the relief of poverty and distress, but has a wider signification, which embraces the improvement and promotion of the happiness of man.'" [page 1033.]

The most generally accepted definition of the word "charitable", taken from the Girard Case, supra, is found in the extensively cited case of Ould v. Washington Hospital for Foundlings, 95 U.S. 303, 311, 24 L.Ed. 450, wherein it is expressed that "a charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man."

It is quite clear that what is done out of good will and a desire to add to the improvement of the moral, mental, and physical welfare of the public generally comes within this meaning of the word "charity." To crowd out coarseness, cruelty, brutality from social man undoubtedly results in this betterment. A society which aims, as this does, to cause savagery present to some degree in us all to be reces-

sive, benefits mankind. Its purpose in teaching forbearance from inflicting harm and pain is a high and noble one. This was the aim of this organization.

The kindness and mercy expressed in "not needlessly setting foot upon a worm," to paraphrase a line of William Cowper, are the human traits this society seeks to make dominant in man. Infusing these qualities in man's nature makes for his moral improvement. The aims and purposes of the New England Anti-Vivisection Society are unequivocally for the public good and are charitable within the meaning of the provisions of the Act.

That conscientious medical men believe that animal experimentation advances the science of medicine does not alter the situation one iota. It is of no consequence in this case that a difference of opinion exists as to what constitutes justifiable infliction of pain.

The circumstances of the society favoring the passage of the legislation described above did not in any way place the society outside the provisions of the Act. This legislation was merely incidental to carrying out the purposes and accomplishing the purposes of the society. The help of the Legislature was necessary to enable it to advance its aims. This activity was as expressed in the case of Slee v. Commissioner of Internal Revenue, 2 Cir., 42 F. 2d 184, 185, 72 A.L.R. 400, "mediate to the primary purpose, * * * ancillary to the end in chief."

This incidental activity does not militate against the contention that this organization was "exclusively" organized and operated for charitable purposes.

I find that the New England Anti-Vivisection Society was organized and is operated exclusively for charitable purposes within the meaning of the Revenue Act of 1926 as amended by the Revenue Act of 1932, and the amount of the bequest made to it was deductible from the value of the gross estate for Federal Estate Tax purposes. See Pennsylvania Co. for Insurance on Lives, etc. v. Helvering, 62 App.D.C. 254, 66 F.2d 284; In re Foveaux, [1895] 2 Ch. 501; Armstrong v. Reeves, Ir.L.R. 25 Eq. 325; Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458.

I reach an entirely different conclusion in regard to the bequest of the Freethinkers of America, Inc. This organization confined its activities to its own members as far as any evidence introduced in the instant case showed. It cannot be contended successfully that it was engaged in educating the general public to its views, and it is of little help to say that the public would be "educated" if it adopted its views. In its purpose to separate church and state it confined its activities principally to the conduct of litigation seeking to prevent the expenditure of public monies in behalf of those engaged in the promotion of religion and in suits of the nature of those described above in this opinion. It sought to regulate the exercise of governmental functions, such as taxation of church properties and those devoted to the advancement of religious purposes. This was its general activity and, consequently, its purpose could not be said to be "exclusively" charitable, educational, or scientific. Slee v. Commissioner of Internal Revenue, supra.

I find that this organization is not a corporation within the meaning of Section 303(a) (3) of the Revenue Act of 1926 as amended by Section 807 of the Revenue Act of 1932, and the bequest to it was not deductible from the value of the gross estate for Federal Estate Tax purposes.

The plaintiff's motion for judgment is granted, with costs, in accordance with the above opinion. The defendant's motion for judgment is denied. By agreement of the parties hereto a judgment is to be entered in accordance with a stipulation to be entered into by the parties and submitted to the Court for approval.

The requests of the parties for findings of fact and conclusions of law, so far as they are consistent with the above, are granted, and, to the extent that they differ from the above findings and conclusions, they are denied.