Argued March 2, affirmed November 16, 1966, petition for rehearing allowed February 14, reargued April 3, former opinion adhered to May 17, 1967

# FRIENDSVIEW MANOR, *Appellant, v.* STATE TAX COMMISSION, *Respondents.*

420 P. 2d 77
427 P. 2d 417

*Donald A. Schmechel,* Seattle, Washington, argued the cause as amicus curiae in support of appellant, on behalf of American Association of Homes for the

Aging. With him on the brief were Black, Kendall, Tremaine, Boothe & Higgins and Stewart Tremaine, Portland, and Wright, Innis, Simon & Todd and P. Cameron DeVore, Seattle, Washington.

*William K. Shepherd,* Portland, argued the cause for appellant. With him on the briefs was G. Bernhard Fedde, Portland.

*Gerald F. Bartz,* Assistant Attorney General, Salem, argued the cause for respondents. With him on the brief were Robert Y. Thornton, Attorney General, and Alfred B. Thomas, Assistant Attorney General, Salem.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

DENECKE, J.

The issue is whether Friendsview Manor, a retirement home, is a charitable institution and, therefore, exempt from real property taxation. The State Tax Commission found that it was not and the Tax Court affirmed such decision. 2 OTR 130 (1965). The Manor appeals.

ORS 307.130 provides:

"* * * the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(1) Except as provided in ORS 740.080, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

The Manor is the product of the inspiration of the Oregon Yearly Meeting of Friends Church (Quakers). In 1956 the plaintiff was organized as a nonprofit corporation; there are no members. Later, the Board of Directors hired a Quaker pastor at $480 per month as executive director.

The principal money raising device was the founder's fee paid by those who wished to have a room in the Manor. Initially, the fee was $5,000 for a single person. It was ultimately raised to as high as $8,500 for the best rooms. The first $100 from the founder's fee was irrevocably placed in the Charitable Assistance Fund. This fund also received donations which totaled $15,000 in August, 1964.

The founder's fee may be partially refunded if a resident leaves. However, one-eighth of such fee is considered expended for each year of residency and is not refundable. If a resident dies, any unexpended balance of the founder's fee is then considered expended and no part of the fee is refunded to anyone. When a room is vacated, by death or otherwise, it is resold by the Manor. The first $100 of the purchase price is again transferred to the Charitable Assistance Fund and the balance is handled just as is the founder's fee.

In 1959 a loan of $1,450,000 was obtained. The loan was secured by a mortgage on the land and the about-to-be-built Manor and was guaranteed by the Federal Housing Administration. In 1961 the 125-unit building with the community facilities common to retirement homes was completed and residents moved in.

In addition to the living and community accommodations, the Manor provides board and health care. These are paid for by monthly fees. Initially, the fee

was set at $85 per month per person; increased expenses forced a raise to $117.50.

In making financial projections at the beginning of the operation it was assumed that the founder's fees and resale fees would be the primary source of funds for the mortgage payments. It was also assumed that the Manor would receive $5,000 in gifts per year to apply on mortgage payments. The mortgage payments in 1961-1962 were $77,000. It was assumed that the monthly payments for board and health care, plus miscellaneous income, would pay operating costs.

These assumptions have not proved out. By August 31, 1964, the Manor had lost $133,613. The loss in 1961-1962 was $60,000 and in 1962-1963, $54,000. However, in 1963-1964 the loss was only $800. From the financial statements in evidence it appears that the loss occurred both in operations and in funds for capital payments.

Thirty-four thousand dollars has been expended from the Charitable Assistance Fund for the four years ending August, 1964. Expenditures took the form of payment of all or part of the founder's fees for certain needy residents and payment of part of the monthly fees for board and health care.

The Articles of Incorporation provide:

"This corporation is formed solely and exclusively for religious, charitable and non-profit purposes, and the earnings, if any, of this corporation shall be used exclusively for the purposes for which this corporation is formed, as hereinabove described. All property, acquired by the corporation, real or personal, and all increments, interests, or earnings thereof are and shall be devoted in perpetuity and irrevocably dedicated to religious, charitable and non-profit purposes, and in the event of the liquidation, dissolution, or abandon-

ment of this corporation, its property will not inure to the benefit of any private person."

The Bylaws provide:

"Section 2.—Distribution on Dissolution

"In the event of liquidation, dissolution or abandonment of this corporation, after the payment of all of its legal liabilities and obligations, the excess shall be paid to Oregon Yearly Meeting of Friends Church for use in providing for the needs of the aged on an impartial basis without regard to race, color, nationality, creed, or political beliefs."

The Articles of Incorporation further provide:

"No applicant will be denied the right to occupy housing facilities provided by this corporation on the basis of his race, color, creed or national origin."

In *Oregon Methodist Homes, Inc., Willamette View Manor, Inc. v. State Tax Commission,* 226 Or 298, 360 P2d 293 (1961), we held that a retirement home for the elderly was not entitled to the charitable real property tax exemption. The financial plan and the operation of the Manor in that case were different in several significant respects from those of Friendsview Manor. The founder's-fee plan was used, however. At Willamette View Manor each founder acquired a contractual right to life care for a monthly fee of $100 and each founder could name his successor, which successor could occupy such room for life with no additional payment for the room. All initial residents paid their full founder's fee and monthly care fee. Upon dissolution the assets were to be distributed to each member in proportion to the contribution made.

We agree with the observation of the Tax Court that Friendsview Manor has qualified for a charitable

exemption in many of the respects which were lacking in the Willamette View Manor claim. We also agree with the Tax Court that, nevertheless, Friendsview does not qualify for the charitable exemption.

The Manor does in a few instances pay all or part of the founder's fee and monthly care charges for persons unable to pay. Admittedly, most of the residents pay their own way. The exemption statute only exempts property "*exclusively* occupied or used in the * * * charitable * * * work carried on by such institutions." ORS 307.130. (Emphasis added.) If the application of the charitable exemption were dependent upon whether or not the property was used for caring for those unable to pay for room or care, the Manor could not meet the "exclusive" requirement of the statute.

The Manor's principal contention is that care for the elderly, whether rich or poor, is a "charitable work" and, therefore, real property used in carrying on such work is real property "actually and exclusively occupied or used in * * * charitable * * * work." The Manor points out that § 368, 2 Restatement (Second), Trusts, states:

"Charitable purposes include
"(a) the relief of property;
(b) the advancement of education;
(c) the advancement of religion;
(d) the promotion of health;
(e) governmental or municipal purposes;
(f) other purposes the accomplishment of which is beneficial to the community."

We will assume, without deciding, that caring for the aging, rich or poor, is a charitable purpose.[1]

---

[1] None of the briefs cite Pape v. Title and Trust Co., 187 Or 175, 210 P2d 490 (1949), in which we held that a bequest in

The Manor reasons that if a group of persons pays funds to a corporation to construct facilities to provide services to the same group and the providing of such services is a charitable work, as we are assuming it is here because it was caring for the aging, the facilities are exempt because they are used "exclusively in charitable work." The Manor contends that it is immaterial that the group that provides the funds by payment of past, present and future founder's fees is also the group that is receiving the benefits. This is identical to what exists when an individual aged person provides his own home or a group of aging persons constructs a cooperative apartment. The purpose in all three is providing housing for the aging, a charitable purpose. It is not suggested that the latter two categories also should have tax-exempt housing.

We conclude that the basic deficiency in the Manor's reasoning is that it would grant a charitable tax exemption to housing for aging persons paid for by these same aging persons.

If the Manor's contention is correct, the charitable tax exemption must be granted to many other self-help projects that provide services which if provided *to others* are held to be for charitable purposes.

The construction of a swimming pool or golf course can be a charitable purpose. Such facilities benefit the community by promoting health and teaching physical education. According to the reasoning of the plaintiff, a group can pay its funds into a nonprofit corporation, organize as Friendsview Manor is, have a pool or golf course built, and credit each hour spent in the pool or a round upon the course against the

trust to purchase a site and construct and equip a building for "homeless, self-supporting women" was not for a charitable purpose.

initial fee paid to construct the facility, and the pool or golf course would be exempt as used exclusively in a charitable work.

If a donor created a trust to provide housing for college students who would be required to pay a reasonable fee, the gift may be held to create a charitable trust (Cf. *Kappa Gamma Rho v. Marion County,* 130 Or 165, 279 P 555 (1929)), because the housing of college students appears to be a charitable purpose. Under the taxpayer's reasoning, a fraternity corporation could be formed, a house built with the advance payment of house bills, and the corporation successfully claim a charitable exemption because a charitable purpose is being served.[2]

The Manor reasons that the fact that the aging persons pay for their own housing does not destroy the charitable nature of the Manor because we have held that hospitals are entitled to the charitable exemption from property tax although patients paid for the hospital services rendered. *Corporation of Sisters of Mercy v. Lane County,* 123 Or 144, 155, 261 P 694 (1927), etc.

The Manor has failed to observe that what was being paid for in our hospital decisions is completely different from what is being paid for in the present case.

In our hospital cases the evidence was that the patient who was financially able, paid for his care. There is no evidence mentioned in any of our cases that persons paid money into a fund to build the hospital and were promised in return that they could credit such payments against the charges for the use of such hospital. We know from common experience

---

[2] ORS 307.134(f) expressly stated that fraternities are not entitled to exemption as a fraternal organization.

that "charitable" hospitals are largely built by donations from persons with no agreement for the providing of hospital care in return for the contribution. If the donors later coincidentally happen to use the facilities of the hospital, they will be charged at the same rate as a nondonor. We do not know how hospital income is spent; however, we assume that the distinction we make is not completely precise and that some of the moneys received in payment of charges for care will go toward building maintenance and perhaps repayment of building acquisition costs. However, this is incidental and not the main source of capital funds for a "charitable hospital."

In the present case it is the land and the building which are claimed to be charitably exempt and such property is principally to be paid for by the present and future users of the facilities. In the hospital cases the property held charitably exempt was acquired by donation of persons who donated to provide services for *others,* not themselves.

■ We hold that in order to cloak property with the charitable exemption it is essential that the property be donated by others and not purchased by the users of the property in consideration for being granted such use.[9]

---

[9] Fifield Manor v. County of Los Angeles, 188 Cal App2d 1, 10 Cal Rptr 242 (1961); Topeka Presbyterian Manor, Inc. v. Board of County Com'rs, 195 Kan 90, 402 P2d 802 (1965); and Holbrook, Maxwell and Rourke, *Fifield Manor Tax Refund Cases: True Meaning of "Charity" Under California Welfare Tax Exemption Restated,* 35 S Cal L Rev 276 (1962), are to the contrary.

In Benevolent Society v. Kelly, 28 Or 173, 192, 42 P 3, 30 LRA 167, 52 Am St Repts 769 (1895), the taxpayer was a benevolent society; however, the court in summary pointed out that its revenues were used exclusively for "payment of current expenses and the relief of the poor and needy." See Bogert, Trusts & Trustees (2d ed 1964), § 367, particularly pp 47-52 and notes 36 and 38.

*Ore. Physicians' Serv. v. State Tax Com.,* 220 Or 487, 349 P2d 831 (1960), involved the Oregon corporate excise tax, which provides an exemption for organizations "operated exclusively for the promotion of social welfare." ORS 317.080(6). We there stated:

"* * * A rule of thumb capable of serving the purposes of ORS 317.080(6) in cases of this kind would very likely envision that in order for the activities of a taxpayer to entitle him to exemption as 'social welfare' work they must be calculated to benefit some other group than the one which supplies the money and directs its disposition. The group benefited may be large or small, definite or indefinite in number, but in the benefaction some motive of altruism must clearly shine forth." 220 Or at 506.

In *In re Henderson's Estate,* 17 Cal2d 853, 859-860, 112 P2d 605 (1941), the court stated this distinction between providing for one's self and providing for others:

"If a group of individuals agree to contribute equal amounts into a fund to be used for the benefit of all, such a group may well be said to be non-charitable in nature because each individual is providing only for his own welfare and does not intend to make a free contribution toward the assistance of others. If an outsider, however, receiving no benefits from the organization, makes a gift to it, that gift may well be a charitable one if the members of the organization are sufficiently numerous and it is organized for a purpose beneficial to society such as providing for medical assistance to its members. Such a donor has the charitable purpose of assisting those members of a large group who become sick, without any benefit to himself, and the gift thus may be a charitable one."

In *La Societe Francaise, etc. v. California Employ. Com.*, 56 Cal App2d 534, 133 P2d 47, cert den 320 US 736, 64 S Ct 35, 88 L ed 426 (1943), the court made the distinction between providing hospital care for others and for one's self. Members of La Societe paid an admission fee and monthly dues into La Societe. If they became ill they received gratis from La Societe medical and hospital benefits. No profit was made; it was an agency of the Community Chest. Nevertheless, the court held it was not a charitable corporation and thus not exempt from the payment of California Unemployment Insurance taxes. The crux of the court's decision was as follows:

"It is true that many decisions may be found defining 'charity' in a comprehensive and liberal manner, so that practically all institutions of social benefit may be included, but such liberal definition is not appropriate when the statute provides that the institution or corporation must be conducted 'exclusively' for charity. * * *. *The true rule is that when people band together to purchase hospital care in the event of illness, it is a business venture rather than a charitable undertaking, and the beneficiaries thereof do not consider the benefits received to be 'charity.'* * * *." (Emphasis added.) 56 Cal App2d at 545-546.

Similarly, the English courts have found an organization formed by its members to provide hospital care to its members to be noncharitable. Salmon, J., stated: "Moreover, the object of the members of the society is not to do good to others but to themselves. This object is not altruistic and is in my judgment not charitable." *Waterson v. Hendon B. C.*, [1959] 2 All E R 760, 764 (QB).

In *In re Hobourn Aero Components Limited's Air Raid Distress Fund*, L R [1946] Ch 194, the object of

the organization was most charitable, relief of air raid distress at Coventry. However, the court held it was not charitable because the donors were helping themselves:

"* * * The point to my mind which really puts this case beyond reasonable doubt is the fact that a number of employees of this company, actuated by motives of self-help, agreed to a deduction from their wages to constitute a fund to be applied for their own benefit without any question of poverty coming into it. Such an arrangement seems to me to stamp the whole transaction as one having a personal character, money put up by a number of people, not for the general benefit, but for their own individual benefit. I am not concerned to dispute the proposition that a fund put up for air raid distress in Coventry generally would be a good charitable gift. I have very little doubt that it would be. But there is all the difference in the world between such a fund and a fund put up by a dozen inhabitants of a street, or, it may be, a thousand employees of a firm, to provide for themselves out of moneys subscribed by themselves some kind of immediate relief in case they suffered from an air raid. The Attorney-General and Mr. Upjohn wish to attribute to the fact that these people were putting up money for their own benefit a very slight importance. To my mind, it is of the greatest importance and is quite conclusive in stamping the character of a private and personal trust upon this fund." L R [1946] Ch at 200-201.

The exact reason behind the government granting tax exemptions to charitable enterprises is not certain because of the hodgepodge of exemption statutes. However, the most reasonable explanation seems to be that the government exempts such organizations from paying taxes because if such enterprises did not exist the government would be required to use tax

dollars to do the job the charitable enterprises are now doing.

■ Using this reasoning, there is no ground for tax exemption for Friendsview Manor. Its residents are largely persons who can financially fend for themselves, either collectively or individually, and the government would not be required to provide housing for them.

Affirmed.

GOODWIN, J., specially concurring.

I concur in the holding that the self-supporting housing project described in the opinion is not entitled to exemption under ORS 307.130. But I do so because I do not believe that the use of the property is a "charitable" use. The dissent contends that the property is used exclusively for a charitable purpose and the majority assumes that it is. In my view a scheme to provide an attractive living environment for a select class of self-supporting persons is commendable. But until the Legislative Assembly chooses to designate age of the occupants as a basis for treating such housing as an exempt charity, I would construe ORS 307.130 strictly against exemption. See *Pape et al v. Title and Trust Co.,* 187 Or 175, 189, 210 P2d 490 (1949).

PERRY, J., dissenting.

It is difficult for me to find a logical or reasonable basis for the conclusion reached by the majority—that the real property of the appellant is not exempt from real property taxes under the provisions of ORS 307.130.

The majority state: "We conclude that the basic deficiency in the Manor's reasoning is that it would

grant a charitable tax exemption to housing for aging persons paid for by these same aging persons."

This statement is based on the reasoning of the preceding paragraph of the majority opinion—that the situation of the appellant "is identical to what exists when an individual aged person provides his own home or a group of aging persons construct a cooperative apartment."

I presume it would be presumptive to ask where the title to this realty used in the above examples resides, what control they have over it, and to whom it passes on the aged resident's demise?

It is quite clear that such reasoning is utterly falacious since the statute can in no way be construed to exempt individually owned property not under some control by the state, since all property of a charity is subject to the requirement by the state that it be used for charitable purposes. Real property used for charitable purposes is dedicated in perpetuity to charitable purposes. When a nonprofit charitable organization is dissolved the property "shall be transferred or conveyed" to another "organization engaged in activities substantially similar to those of the dissolving corporation," ORS 61.530 (3), and the circuit courts of this state are granted jurisdiction and authority to enforce dissolutions and compliance with this requirement upon application of the attorney general if the funds or property should be used for other than the purposes intended. ORS 61.565 and subsequent statutes.

> "One obvious reason for exemption of the property of charitable corporations from taxation as distinguished from the property of individuals is that such a corporation is subject to the supervision of the courts at the instance of the attorney

general (11 C.J. Charities, sec. 84, p. 366) whenever it seeks to devote its property to other than the purposes for which it was organized, while an individual is not subject to such supervision, but may exercise plenary control over his property and without notice or explanation make any change or changes he may wish. A corporation of the character here discussed cannot thus alter its purpose without at least amending its articles of incorporation and thereby destroying its right to the statutory exemption." *Waller v. Lane County,* 155 Or 160, 171-172, 63 P2d 214.

Therefore, I feel the majority should state the title to and control over the property in question which its occupants acquire.

If these tenants do not acquire a fee interest in the property, and I am sure they do not, but are merely donors, as stated elsewhere in the majority opinion, are they not entitled to deduct their entrance fees from income tax as a charitable donation since it is admitted the Manor is carrying on a charitable purpose?

As a second argument against granting appellant's petition for tax exemption, the majority state: "that in order to *cloak property with the charitable exemption it is essential that the property* [I presume they mean the property sought to be exempted] *be donated by others and not purchased by the users of the property in consideration for being granted such use."* (Emphasis mine)

There is, of course, no evidence that the users are purchasing this property in consideration for being permitted to live in the property. The agreement in evidence discloses the tenants are purchasing a *right* to live in certain quarters and to be properly cared for as long as they live. The tenant may enforce his contract or lease, but he acquires no fee interest in

the property. The property is being purchased by the nonprofit appellant from the proceeds of the contract.

The majority apparently overlook the words of the exemption statute which must be applied to the facts in this case. The statute, ORS 307.130, applies to all "property *owned* or being *purchased* by the charitable corporation." (Emphasis mine) There is nothing in the statute which even suggests that only real property *donated to a charitable organization* shall be exempt, and it specifically exempts real property being purchased.

The pertinent question that should be answered by the majority, but which is not, is: May a nonprofit organization which is doing charitable work charge those able to pay for the use of its facilities used in carrying out its charitable purposes without destroying its charitable exemption?

I venture to state that very few charitable organizations that dispense services, such as hospitals, schools and orphanages, have acquired all of the real property which they have acquired entirely through gifts.

This fact was recognized by this court in *Corporation of Sisters of Mercy v. Lane County,* 123 Or 144, 261 P 694, where a hospital was granted real property tax exemption. The facts therein disclose that at the corporation's inception it had resources of $2,000, and "the only sources of income which this corporation has or will have is the moneys which may be derived *by them from schools and hospitals, together with the donations* which may be made to it from time to time by the charitable." 123 Or 144, 147. (Emphasis mine)

The evidence discloses that the Sisters of Mercy hospital was not operated for profit, that if any surplus was accumulated it went to pay off the indebted-

ness. It also discloses that the corporation owned and was operating a 50 to 60 bed hospital.

Also, this court in *Benton Co. v. Allen et al.,* 170 Or 481, 133 P2d 991, has recognized the fact that a charitable organization is not to be denied its charitable real property tax exemption because it borrows money to build and equip a hospital where it may carry out its charitable work. We stated, p. 488:

> "The defendant insists, however, that there is no distinction between issuing bonds, in effect in payment for the hospital property, and borrowing money with which to build and equip a hospital. It argues that if a charitable corporation may borrow money for the purpose of building and equipping a hospital, *which evidently it may* (Waller v. Lane County, 155 Or 160, 63 P2d 214; Sisters of Mercy v. Lane County, 123 Or 144, 261 P 694), without losing its character as a charitable corporation, there is no reason why it may not issue bonds in consideration of a conveyance to it of a hospital already built and equipped. * * *"

If the majority are correct in their premise, I feel sure there are many charitable organizations which are now receiving tax relief that should not.

If the majority feel that these organizations have complied with their requirements because a portion of the real estate was donated by charitably minded persons, they should set out what portion is required by donation and what percentage may be paid from income.

Finally, the majority seem to reason that those who are using the facilities of the Manor are the same group of persons who organized the corporation for their own benefit.

There is not one iota of evidence in this case that

will support such a conclusion and the facts the majority recite refute their own statement.

They state the corporation had its inception through efforts of the Quaker members of the church and that the Articles of Incorporation show the use of the facilities provided are "for use in providing for the aged on an impartial basis without regard to race, color, nationality, *creed* or political beliefs." (Emphasis mine)

The evidence disclose that only 50 per cent of the residents are of the Quaker faith in a total of 296 occupants and at least 14 other denominations are represented; also some of nondenominational belief.

There is no evidence that any of these aged residents participated to the slightest degree in the preparing or planning of this charitable venture or ever expected to use the facilities until after they discovered they were in fact available.

For a legal foundation upon which to build the illogical conclusions reached by the majority, they depend upon *Ore. Physicians' Serv. v. State Tax Com.*, 220 Or 487, 349 P2d 831; *In re Henderson's Estate*, 17 Cal2d 853, 112 P2d 605; *La Societe Francaise, etc., v. California Employ. Com.*, 56 Cal App2d 534, 133 P2d 47; *In re Hobourn Aero Components Limited's Air Raid Distress Fund*, L R [1946] ch 194.

Not a single one of these cases has any application to the facts in this case. Each discloses that the expenditures made were for the benefit solely of those expending the money and over which those paying could exercise control of the expenditures.

In *Ore. Physicians' Serv. v. State Tax Com.*, supra, 220 Or 487, 496, the question before the court was stated as follows:

"The crux of the problem before this court is

whether the plaintiff is an association 'not organized for profit but operated exclusively for the promotion of social welfare.' "

The facts of that case disclose that the Oregon Physicians' Service was formed by physicians to provide prepaid medical insurance to those who sought membership in the organization and thus assure payment for medical service rendered to the ill who had become members of the group. The association assured payment to the doctors, and we stated, p. 505: "* * * we hold that the association fails to show that it is 'not organized for profit' * * *."

The tax commission admits that appellant herein was not organized for profit.

Also, in the case of *Ore. Physicians' Serv. v. State Tax Com.,* supra, the court was not examining the question of a charitable purpose, but of what constitutes "social welfare" and stated, p. 506:

"In our view the test of 'social welfare' adopted by the court of appeals for the second circuit in Consumer-Farmer Milk Cooperative v. Commissioner, supra, is a correct one. If the 'dominant and controlling' motive of the taxpayer is 'primarily to benefit the taxpayer's membership economically, and only incidentally to further larger public welfare,' then the exemption must be denied. A rule of thumb capable of serving the purposes of ORS 317.080 (6) in cases of this kind would very likely envision that in order for the activities of a taxpayer to entitle him to exemption as 'social welfare' work they must be calculated to benefit some other group than the one which supplies the money and directs its disposition. The group benefited may be large or small, definite or indefinite in number, but in the benefaction some motive of altruism must clearly shine forth."

When the quotation in the majority opinion is read in context it is clear the court was distinguishing between those instances where the taxpayer's motive in entering into an enterprise was primarily to benefit the taxpayer's business venture with the benefit to the public at large an incidental result, and those instances where the primary purpose of a taxpayer is to benefit the public at large and the income from the venture although in the nature of a return from a business is used solely as means of promoting the general public welfare and not for profit.

The citation of the majority from *In re Henderson's Estate,* supra, shows in itself the fallacy of its application to the facts of this case. The first line of the quotation assumes the organization of a group to care for themselves. There is no evidence in this case of a group of persons organizing Friendsview Manor and contributing to a common fund to care for each member of the group's general welfare. The facts, as previously stated, disclose the formation of an organization to care for the aged of the whole world, regardless of race, creed or color. The management of Friendsview Manor seeks only the primary good of the aging. The managing members of the organization get nothing for their labors. They seek only to provide a good home and reasonable comfort and care for those who seek shelter in the home. Thus there could be no predetermined group seeking to aid only themselves.

The case of *La Societe Francaise, etc. v. California Employ. Com.,* supra, falls in the same category as the quotation from *In re Henderson's Estate,* supra, for the emphasized quotation discloses that a group of people banded together for their own benefit. The same is true of *In re Hobourn Aero Components Limited's Air Raid Distress Fund,* supra.

The facts in the present case show only that each elderly person who seeks the shelter of the home is paying solely and individually for the services he or she expects to receive, without regard to the welfare of any predetermined organized group, present or future, so as to "stamp" the payments "with the character of a private and personal trust fund."

So far as the record in this case is concerned, the organizers of Friendsview Manor had not the slightest notion of who might seek their accommodations any more than a hospital knows who its next patient might be. For this court to, in effect, hold that those who are now occupying Friendsview Manor banded together and established the Manor for their own benefit is an utter contradiction of the record and a fantastic fantasy.

In my opinion, in the following statement of facts and citations of law applicable thereto is found the answer to the questions raised on this appeal.

The factual background of plaintiff discloses, as do most of the nonprofit charitable institutions providing meals, lodging, nursing care and educational instruction, that it is church-sponsored. Friendsview Manor was incorporated as a nonprofit organization in November, 1956. The Manor, a five-story, reinforced concrete building situated on approximately twelve acres of land, contains 125 living units, together with an office, library, lounges, combination dining room and auditorium, kitchen, room for recreational and hobby facilities, and an infirmary. The building of the Manor was commenced in 1960 and completed in March, 1961. The structure is furnished for the accommodation of the elderly. Each room is equipped with an alarm system whereby the desk may be notified in case of illness, extra-wide doors to accommodate

wheelchairs, grab rails on the stairways, and numerous other types of equipment for the safety of the aged and infirm. The individual units on the average are 12 by 15 feet with a large bathroom and closet attached. The infirmary, which is fully staffed, is equipped with 13 beds, and also therapy rooms.

To provide these physical facilities, the plaintiff obtained an F.H.A. loan in the amount of $1,450,000, which it hopes to liquidate predominately from the charges made to those occupying the premises. The present rates are $7,500 for the standard room, $8,000 for balcony rooms, and $8,500 for each corner room. The monthly board bill and health care originally was $85 for a single person and $165 for a couple. Because of increased operational costs this charge has been raised and the plaintiff's accounts still disclose an operating loss.

At the time of incorporation, it was provided that "[t]his corporation is formed solely and exclusively for religious, charitable and non-profit purposes, and the earnings, if any, of this corporation shall be used exclusively for the purposes for which this corporation is formed, as hereinabove described. All property acquired by the corporation, real or personal, and all increments, interests, or earnings thereof are and shall be devoted in perpetuity and irrevocably dedicated to religious, charitable and non-profit purposes, and in the event of the liquidation, dissolution, or abandonment of this corporation, its property will not inure to the benefit of any private person."

Also, a trust fund, called the "charitable assistance fund," was created for the assistance of those who were financially unable to meet all the charges made to those fully able to finance themselves. This fund was created by donations from charitably-minded

persons, $3,407 in 1963, and by setting aside $100 from the rental charge for life occupancy of the rooms as they were rented and re-rented upon death of the occupant. In 1961, $16,812 were expended for this purpose and in 1962, $7,475.

There is no contention that the directors, or anyone connected with the management and operation of the Manor, receive any gain, profit or private advantage from its operation.

Article II, paragraph f., of the Articles of Incorporation provides:

"No applicant will be denied the right to occupy housing facilities provided by this corporation on the basis of his race, color, creed or national origin."

The bylaws provide that the powers of the corporation shall be vested in the board of directors. The bylaws also provide that "[n]o person who is a resident in the Manor as a 'Founder' or member shall be a member of the Board of Directors during residency."

It will thus be noted that the facilities of the Manor are open to the general public and that those who engage life care have no control over the expenditure of their funds or the management of the Manor.

The primary basis for rejecting the claim of a charitable purpose in the case of *Methodist Homes, Inc. v. Tax Com.*, 226 Or 298, 360 P2d 293, was the fact that the charter of the nonprofit corporation provided upon dissolution for the distribution of the assets to the members of the association as contrasted with the requirement of statute that the assets be dedicated in perpetuity to charity, as was done by Friendsview Manor.

It is well established in this state that taxation is

the rule and exemption is permitted only as provided by legislative grant. *Methodist Homes, Inc. v. Tax Com.*, supra; *Benton Co. v. Allen et al.*, 170 Or 481, 133 P2d 991; *Corporation of Sisters of Mercy v. Lane County*, 123 Or 144, 261 P 694.

ORS 307.130, under which plaintiff seeks exemption, reads as follows:

"Upon compliance with ORS 307.162, the following property owned or being purchased by incorporated literary, benevolent, charitable and scientific institutions shall be exempt from taxation:

"(1) Except as provided in ORS 740.080, only such real or personal property, or proportion thereof, as is actually and exclusively occupied or used in the literary, benevolent, charitable or scientific work carried on by such institutions."

ORS 307.162, mentioned therein, provides only that a proper application be filed by the organization with the county assessor, and no issue is presented upon this point.

It is to be noted that the legislature has not defined the words "benevolent" and "charitable" in the statute, but it is clear that the statute contemplates that such organization to be exempt must be organized to carry on a legally recognized benevolent and charitable purpose without gain or profit or private advantage. *Ackerman v. Phys. & Surgeons Hosp.*, 207 Or 646, 288 P2d 1064, 298 P2d 1026; *Hamilton v. Corvallis Hosp. Ass'n.*, 146 Or 168, 30 P2d 9; *Corporation of Sisters of Mercy v. Lane Co.*, supra.

Since we have no legislative definition, we must look to those purposes recognized in the law as benevolent and charitable. A primary question then presented is whether providing for the aged is a legally recognized charitable purpose.

Providing for the aged was recognized as a charitable purpose, distinct from caring for the poor, as early as the year 1601. 7 Statutes, 39 Eliz to 2 Ch II, ch 4, p 43.

Lawful charitable purposes extend far beyond giving to the relief of the poor and needy.

> "* * * the courts have defined 'charity' to be something more than mere alms-giving or the relief of poverty and distress, and have given it a significance broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive the benefits." *Young Men's Christian Ass'n v. Lancaster County,* 106 Neb 105, 111, 182 NW 593, 34 ALR 1060.

In the words of the late Mr. Chief Justice ROBERT S. BEAN, "* * * [*i*]*f that only be charity which relieves human want, without discriminating among those who need relief,* then, indeed, it is a rarer virtue than has been supposed." (Emphasis supplied.) *Benevolent Society v. Kelly,* 28 Or 173, 191, 42 P 3, 30 LRA 167.

Examination of many court decisions discloses without question that the giving of alms to the poor is not a necessary attribute of every benevolent and charitable purpose.

Under "charity", Black's Law Dictionary, 4th ed, p 296, states:

> "* * * All which aids man and seeks to improve his condition. Wadell v. Young Women's Christian Ass'n, 133 Ohio St. 601, 15 NE2d 140, 142. * * * Amelioration of persons in unfortunate circumstances, Second Nat. Bank v. Second Nat. Bank, 171 Md. 547, 190 A. 215, 111 A.L.R. 711. * * * Any purpose in which the public has an interest, Collins v. Lyon, Inc., 181 Va. 230, 24 S.E.2d 572, 580. Any purpose of general benefit untainted by motives of private gain. Stearns v. Association of Bar of City of New York, 276 N.Y.S. 390, 395, 154 Misc. 71.

Any scheme or effort to better the condition of society or any considerable part thereof. Tharpe v. Central Georgia Council of Boy Scouts of America, 185 Ga. 810, 196 S.E. 762, 764, 116 A.L.R. 373. * * * General public use which extends to the rich as well as to the poor. Hamilton v. Corvallis General Hospital Ass'n, 146 Or 168, 30 P2d 9, 14. * * * Improvement of spiritual, mental, social, and physicial conditions. Andrews v. Young Men's Christian Ass'n of Des Moines, 226 Iowa 374, 284 N.W. 186, 192. * * * Physical, mental or moral betterment. In re Tollinger's Estate, 349 Pa. 393, 37 A.2d 500, 501, 502. * * * Promotion of happiness of man. Old Colony Trust Co. v. Welch, D.C. Mass., 25 F. Supp. 45, 48. * * * Promotion of well-doing and well-being of social man. Krause v. Peoria Housing Authority, 370 Ill. 356, 19 N.E.2d 193, 199. * * * Whatever proceeds from sense of moral duty or feeling of kindness and humanity for relief or comfort of another, Doyle v. Railroad Co., 118 Mass. 195, 198, 19 Am. Rep. 431. * * *."

In 14 CJS, Charities 440-441, § 12, it is stated:

"* * * Although the relief of the poor, or a benefit to them in some way, is in its popular sense a necessary ingredient in a charity, this is not so in the view of the law, and hence a gift to a public use is not unlawful as a charity because it is not limited to the purpose of relieving the sick or poverty stricken, or because it extends to the rich as well as to the poor. A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man. * * *"

In *Hansen v. Oregon Humane Soc.,* 142 Or 104, 18 P2d 1036, we stated that the protection of animals or birds was a charitable purpose.

The Restatement of the Law defines a charitable purpose as follows:

"A purpose is charitable if its accomplishment

is of such social interest to the community as to justify permitting the property to be devoted to the purpose in perpetuity.

"There is no fixed standard to determine what purposes are of such social interest to the community; the interests of the community vary with time and place. * * *"

2 Restatement, Trusts 2d, 248, ch 11, § 368b.

The care of the aging is of great public interest. Note that the Report of the Proceedings of the Third Washington State Governor's Conference on Aging, May 28-29, 1964, The Older American, Report of the President's Council on Aging, 1963, The White House Conference on International Cooperation, Report of the Committee on Social Welfare, November 28-December 1, 1965, U.S. Housing & Home Finance Agency, Proceedings of the Interfaith Conference on Housing for Senior Citizens, April 20-21, 1964, all disclose a compelling interest of society to meet the social and physical needs of the aged separate and apart from financial.

In 1958, the Congress of the United States passed an act entitled "White House Conference on Aging Act," 1 US Code Congressional and Administrative News, p. 2101, declaring:

"(1) The number of persons forty-five years of age and older in our population has increased from approximately thirteen and one-half million in 1900 to forty-nine and one-half million in 1957, and the number sixty-five years of age and over from approximately three million in 1900 to almost fifteen million at the present time, and is expected to reach twenty-one million by 1975."

On page 2102:

"(5) [T]he lack of suitable facilities and opportunities in which middle-aged persons can learn

how to prepare for the later years of life, learn new vocational skills, and develop and pursue avocational and recreational interests is driving many of our older persons into retirement shock, premature physical and mental deterioration, and loneliness and isolation and is filling up our mental institutions and general hospitals and causing an unnecessary drain on our health manpower; * * *."

The President's Council on Aging, 1963, The Older American, page 28, notes:

"Persons retiring 5, 10, or more years from now will be accustomed to more free time in their active earning years than are most older Americans today. Shorter hours of work per day, shorter work-weeks, longer yearly vacations, earlier retirement for all will help prepare tomorrow's Older American for active later years. Retirement will more often be anticipated as an opportunity to embark on a second career, a chance to grow in new interests, find new avenues of creativity, continue to live fully, adventurously, and generously, with the knowledge that activity itself is an essential ingredient of successful living in the later years.

"But today's picture, all too frequently, is one of disillusioned persons suddenly being forced into a completely strange period of inactivity, with no place to go, nothing to do, no purpose. It is not surprising that many normal men and women react badly to these circumstances. Inertia, boredom, and tentative withdrawal can quickly lead to isolation. And isolation deprives human beings emotionally, spiritually, and socially. Isolation leads to disillusionment and bitterness. It should not—must not—be tolerated in a country that places as high a value as our country does on the worth of each man.

"Our communities have the primary responsibility. The small villages are no less responsible for the well-being of all their citizens than are the metropolitan areas. Wherever there are people

who have retired, who are older, whose lives are no longer full or meaningful or satisfying, there is need for some kind of community action that will give them opportunities for useful, rewarding participation."

That these humanitarian principles exist is disclosed in the fact that the federal government is now providing subsidized hospitalization to all persons over 65 years of age regardless of their financial circumstances. Social Security Amendments of 1965, 79 Stat. 286.

It should also be noted that federal tax relief is also granted to homes operated for the purpose of providing care and comfort for the aged.

In the case of *The Salem Lutheran Home v. Com'r*, 2 TCM 157, 159, the court stated:

"* * * In other words, is the operation of a home for the care and comfort of aged persons, without profit to any individual and from purely religious or philanthropic motives, a charity within the intendment of the statute? We think that it is. * * *

"* * * It does not operate for the benefit of any select group of individuals or institutions. The fact that it is necessary for petitioner to charge a substantial admission fee in order to carry on its work does not deprive it of the status of a tax exempt corporation."

It is thus apparent that it is common knowledge that the aged require care and attention entirely independent of financial needs, and that present-day humanitarian principles demand that those in their declining years have the opportunity to live with as much independence as their strength will permit, in as pleasant and happy surroundings as their finances will reasonably justify.

Other courts which have had occasion to carefully examine this particular issue, care of the aged, as a charitable purpose, have all reached the conclusion that providing for the care, welfare and happiness of human beings in their declining years is a charitable purpose. *American-Russian Aid Ass'n. v. City of Glen Cove,* 246 NYS2d 123, 41 Misc2d 622 (1963); *Fredericka Home for the Aged v. San Diego County,* 35 Cal2d 789, 221 P2d 68 (1950); *Fifield Manor v. County of Los Angeles,* 188 Cal App2d 1, 10 Cal Reptr 242 (1961); *Pacific Home v. County of Los Angeles,* 41 Cal2d 844, 264 P2d 539 (1953); *Solheim Lutheran Home v. County of L.A.,* 152 Cal App2d 775, 313 P2d 185 (1957); *Samarkand of Santa Barbara, Inc., v. County of Santa Barbara,* 216 Cal App2d 341, 31 Cal Reptr 151 (1963); *Topeka Presbyterian Manor v. Board of County Commissioners,* 195 Kan 90, 402 P2d 802 (1965); *Old Colony Trust Co. v. O. M. Fisher Home, Inc.,* 301 Mass 1, 16 NE2d 10 (1938); *The People v. Withers Home,* 312 Ill 136, 143 NE 414 (1924).

Nor is our holding of charitable purpose contrary to our holding in *Methodist Homes, Inc. v. Tax Com.,* supra, much relied upon by the defendant Tax Commission. In that case it was assumed that the care of the aged was a charitable purpose, but in fact Methodist Homes did not qualify as a charitable corporation.

The defendant State Tax Commission appears to have the impression that in *Methodist Homes* this court allied itself with the popular misconception that a charity to be exempt must in some manner be linked to the giving of aid to the poor. We quoted from *Hamilton v. Corvallis Hosp. Ass'n,* supra, 146 Or 168, 312:

"'An important feature * * * is the absence

of any charitable trust fund for the defendant [corporation] to administer. There is no income from a fund or funds created by "contribution of benevolent and charitably minded persons" to be used by the association in relieving the distress of the needy. * * *.' "

And also cited to the same effect *Ackerman v. Physicians & Surgeons Hospital,* supra, 207 Or 646.

However, it must be kept in mind that the *Hamilton* and *Ackerman* cases were dealing with the immunity of hospitals from tort liability and in this tort concept we noted on page 178, *Hamilton v. Corvallis Hosp. Ass'n,* supra:

"In all, or practically all, the cases holding that charitable institutions are immune from liability for the negligence of their servants the reasoning is based on the ground that the institutions derive their funds mainly from public or private charity and that their trustees are charged with the duty of administering such funds exclusively for the charitable uses for which they have been donated."

The court then points out the reason why a charitable institution should not be subject to tort liability, citing from *Hewett v. Women's Hospital Aid Association,* 73 NH 556, 64 Atl 190; 7 LRA NS 496:

" '* * * that to use them [donated funds] for the payment of damages in an action of tort against it would be an unwarranted diversion thereof * * *.' "

Since this court in *Hungerford v. Portland Sanitarium,* 235 Or 412, 384 P2d 1009, has now rejected the immunity theory of charitable corporations for the torts of its servants, no need now exists for retaining a theory that a charity must have and maintain a fund "created by contributions of benevolent and charitably

minded persons to be used * * * in relieving the distress of the needy," in order to qualify as a charitable institution under a statute granting tax exemption generally to benevolent, charitable institutions.

The Tax Commission also argues that since the plaintiff charges for the services rendered to support the purchase and maintenance of the home for the aged it cannot be considered a legal charity. ORS 307.130 specifically provides that property "being purchased" falls within the exemption. Nor has the fact that charges are made to those able to pay been considered as changing the charitable character of the nonprofit corporation.

> "The fact that it charges and receives pay for patients able to pay, does not detract from the charitable nature of the service rendered. In [Lutheran] Hospital Association v. Baker, [40 S.D. 226, 167 N.W. 148] * * * 95 per cent. of the patients were pay patients. In City of San Antonio v. Santa Rosa Infirmary, [sic] [259 S.W. 926] * * * 87½ per cent. were pay patients. In St. Elizabeth Hospital v. Lancaster County, [109 Neb. 104, 189 N.W. 981] * * * only a small per cent did not pay.
>
> * * * * *
>
> "If these incomes from pay patients and donations are used for the purpose of caring for or relieving the sick or disabled and increasing the facility of the institution for that purpose, and are not used for the purpose of declaring dividends or the financial profit (other than the paying of necessary operating expenses) of those connected with or having charge of the institution, such use is simply an extended use for charitable purposes." *Third Order of Nuns of St. Dominic v. Younkin,* 118 Kan 554, 559, 560, 235 P 869, 872.

This statement is in keeping with our holding in *Ben-*

*ton Co. v. Allen et al.,* 170 Or 481, 486-487, 133 P2d 991, where we stated:

> "It is well settled that the fact that fees are charged those patients who are able to pay does not derogate from the charitable character of the institution, provided the income so derived is used to maintain the institution or extend its facilities devoted to charity, or for other charitable purposes. Sisters of Mercy v. Lane County, supra, [123 Or 144, 261 P 694]; Restatement, Trusts, sec. 376."

And in Corporation of *Sisters of Mercy v. Lane Co.,* 123 Or 144, 155, 261 P 694, we stated:

> "30 C.J. 462, thus states the proposition which governs in determining this question:
>
> " 'The test which determines whether a hospital is charitable or otherwise is its purpose; that is, whether it is maintained for gain, profit, or advantage, or not. * * * Where a hospital can otherwise be classed as a charitable institution, the fact that patients who are able to pay are required to do so does not deprive it of its charitable character.'
>
> "There are many authorities sustaining this proposition.
>
> "So if a particular enterprise exists to carry out a purpose recognized in law as charitable, it is a charity. If it is maintained for profit, it is not. See 11 C.J., p. 303."

The fact that fees are charged by a charitable corporation for those who use its facilities to maintain the institution does not detract from its charitable status. 2 Restatement, Trusts 2d, 266, ch 11, § 376c.

The majority state "that what is being paid for in our hospital decisions is completely different from what is being paid for in the present case." They then attempt to distinguish the payments made by patients in a hospital from those made by occupants of the

Manor on the basis that the occupants of the Manor paid into a fund to build the building they hoped to occupy while hospital patients do not.

As pointed out previously, there are no facts in the record that will support such a conclusion.

Hospital patients pay for room, board and care. Occupants of the Manor pay for room, board and care. The only distinction is that the occupants of the Manor pay for their room in advance while hospital patients usually pay at the end of their stay. If this is a reasonable distinction, then I am without reason.

I am unable to find any reasonable distinction between a hospital which charges those able to pay for services rendered, such as room, board and nursing care, and a home for the aged which charges those able to pay for room, board and mental and physical care and comfort in their declining years.

I would reverse the judgment of the trial court, and, therefore, I dissent.

McALLISTER, C. J. and SLOAN, J., join in this dissent.

### ON PETITION FOR REHEARING

*William K. Shepherd,* Portland, argued the cause for appellant on rehearing. With him on the brief was G. Bernhard Fedde, Portland.

*Gerald F. Bartz,* Assistant Attorney General, Salem, argued the cause for respondents on rehearing. With him on the brief were Robert Y. Thornton, Attor-

ney General, and Alfred B. Thomas, Assistant Attorney General, Salem.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

PER CURIAM.

A majority of the court joined in a decision affirming the Tax Court and holding that Friendsview Manor is not entitled to the charitable exemption from ad valorem taxes. *Friendsview Manor v. State Tax Com.*, 247 Or 94, 420 P2d 77 (1966).

Plaintiff's petition for rehearing was granted and we heard additional oral argument.

The court adheres to its former decision.

PERRY, C. J., and McALLISTER and SLOAN, JJ., adhere to the views expressed in their dissent.