Robert Herndon v. Commissioner.
Herndon v. Commissioner
Docket No. 4071-65.
United States Tax Court
T.C. Memo 1968-135; 1968 Tax Ct. Memo LEXIS 163; 27 T.C.M. (CCH) 662; T.C.M. (RIA) 68135; June 27, 1968, Filed *163 W. Ralph Musgrove, for the petitioner Joseph F. Dillon, for the respondent. 663 MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in the income taxes of petitioner as follows: Year
Deficiency
1959
$ 8,668.86
1960
6,537.01
1961
2,980.52
1962
20,878.42
The issue remaining after certain concessions is whether the gains petitioner realized on the sale of certain properties in 1959, 1960, and 1962 are taxable as ordinary income or capital gains. The record in this case consists of a Stipulation of Facts and the testimony at trial of petitioner and three witnesses. The stipulated facts are so found. Findings of Fact Petitioner resided in Dearborn, Michigan, at the time his petition was filed. His income tax returns for the years in question were filed with the district director of internal revenue at Detroit, Michigan. Petitioner is a real estate dealer. He has been engaged in real estate activities since 1909. During the years 1959 through 1962, he was licensed by the State of Michigan as an associate real estate broker and he maintained a real estate office in the Detroit area. *164 He has been so licensed and has maintained a real estate office in or around Detroit since 1924. During the years here in issue petitioner made sales of businesstype realty which he reported as business sales as well as the sales in issue which he reported as capital transactions. Petitioner is the president and principal stockholder of the Robert Herndon Realty Company which was and is engaged in the business of selling real estate on a commission basis. Also petitioner is engaged in the general insurance business and he owns and operates office buildings and golf courses, and he has gains from investments in stocks and real estate. In 1959, petitioner was 71 years of age. His first wife, Della G. Herndon, had died on December 6, 1957. During the years 1959 through 1962, petitioner's principal business activity was the management of two golf courses. He also managed the Robert Herndon Realty Company during this period but he did not handle the realty agency selling activities of the company. He devoted approximately 200 to 250 hours per year from 1959 through 1962 to the realty company and received no salary for this work. The sales giving rise to this case involved property *165 in three different locations. First are the "Pebblebrook Estates Subdivision" lots, of which 3 1/2 were sold in 1959 and another in 1960. The two other groups of lots were located in "Herndon's Dearford-Telegraph Subdivision". They were lots 21 through 28, sold in 1960 and lots 61, 62, 65, 66, and 67, sold in 1962. Pebblebrook Estates Subdivision On December 26, 1925, petitioner's former wife, Della, executed a contract to purchase 39.75 acres of farm land in the western part of Oakland County, Michigan. On October 10, 1932, the property was conveyed to petitioner and his wife. There was a barn and other farm buildings on the farm and one house on the property which petitioner and his wife occupied as a summer home and another house that was occupied by the farm tenant. The tenant farmed the land on shares with soybeans as the main crop. Petitioner realized an income of $700 or $800 a year from the farming operation. Immediately after acquiring the property in 1932, petitioner planted trees and berry bushes, stocked a stream on the property with brook trout and placed pheasants and grouse in the fields. Petitioner and his former wife farmed the land and made it their summer *166 residence until 1949. They planned to build a new home and they hired an architect to prepare the plans. During 1949, Della suffered a coronary thrombosis which required her hospitalization. This and the population movement to the suburbs, coupled with the acquisition of nearby properties by a large department store to build a shopping center, resulted in petitioner's decision not to build the new home but instead liquidate the property. Petitioner had a subdivision plat of the property prepared in 1954. It was approved by the Oakland County authorities on June 15, 1954, and recorded on June 17, 1954. Petitioner incurred the following expenses in connection with the platting, subdividing, and dedication of the property: engineering fees of $4,800, $4,110 for a gravelsurfaced road, and $1,102.50 for a fence. There were 30 lots in the subdivision. The lots were large and homes worth more than $30,000 were built on these lots. Access to the individual lots was by the gravelsurfaced road. There were no sidewalks or paved streets in the subdivision. 664 On April 20, 1955, petitioner had certain restrictions placed on this property. These restrictions provided that no building *167 could be constructed or altered on any lot until the construction or alteration plans were approved by petitioner. Also, before any structure could be put on the property the plans for the same were to be approved in writing by petitioner. In addition, the location and size of mailboxes to be built on the individuals lots were covered by the restrictions. Petitioner had negotiated for the subdivision of Pebblebrook Estates, set the sales policy in connection with the sale of the lots in the subdivision, arranged for the installation of the access road, and set the sales prices of the individual lots. Immediately after the property was subdivided, petitioner listed the lots for sale with the Robert Herndon Realty Company which placed signs in at least four different locations in the subdivision advertising the lots for sale. During the years 1955 through 1965, the following lots in Pebblebrook Estates Subdivision were sold at the prices indicated: Date of Sale
Lot Number
Selling
Price
5/16/55
26
$ 6,500
6/21/55
29
5,400
6/25/55
30
6,000
9/29/55
27
7,000
3/16/56
25
5,000
6/28/57
11 & part of 12
11,500
8/29/58
14
10,750
4/20/59
South 1/2 of 10
5,250
10/8/59
15
12,590
10/20/59
16
12,590
10/20/59
12
12,590
1/11/60
13
12,590
7/22/63
16
12,590
4/30/65
24
7,875
*168 The following schedule reflects the lot number, date of sale, gross sales price, basis, sales expense, and gain for each of the Pebblebrook Estates lots sold in 1959 and 1960: Property
Date Sold
Gross Sales Price
Basis
Sales Expense
Gain
1959
1/2 of Lot 10
4/20/59
$ 5,250
$ 774.46
$1,050
$ 3,422.54
Lot 12 [1]
10/20/59
12,590
774.46
300
11,512.54
Lot 15
10/ 8/59
12,590
1,554.92
2,518
8,517.08
Lot 16
10/20/59
12,590
1,554.92
2,518
8,517.08
1960
Lot 13
1/11/60
12,590
1,554.92
2,718
8,317.08
*169 Herndon's Dearford-Telegraph Subdivision In December of 1923 petitioner negotiated for the purchase of a 20-acre parcel of land in western Wayne County, Michigan. Title was taken in the name of petitioner's wife, Della. Petitioner caused the land to be platted into what is called "Herndon's Dearford-Telegraph Sub." This plat was approved by the Wayne County Board of Auditors May 8, 1924 and filed for record in the Register of Deed's Office May 10, 1924. It divides the tract into four unnumbered blocks containing lots numbered 1 to 159. The platted area was bounded on the north by Ellis Avenue; on the east by Telegraph Road; on the south by Bonaparte Avenue and on the west by Fenton Avenue. Three north and south streets, named Grove Avenue, Glenwood Avenue and Woodbine Avenue, divide the tract into blocks of equal size. In each block there is an alley 20 feet wide extending from Ellis Avenue, south to another east-west alley located 110 feet north of Bonaparte Avenue. All of the lots facing Telegraph Road and Bonaparte Avenue are approximately 20 feet wide and 110 feet long. The rest of the lots range from 39 feet to 41 feet wide and 110 to 127 feet long. Nearly all of the lots *170 in this subdivision were sold during the period from 1924 through 1927 with the exception of lots 24, 25, 26, 27 and 28. Most were sold under land contracts and many of the purchasers defaulted on their contracts and some were sold to the State of Michigan for unpaid taxes. Lot 24 is located at the corner of Telegraph Road and Bonaparte Avenue. It fronts on Bonaparte Avenue and it is 18.5 feet wide and 110 feet long, extending back 665 to the east-west alley. Lots 25, 26, 27, and 28 are to the west of lot 24. They are each 20 feet wide and they, too, extend from Bonaparte Avenue to the east-west alley, or 110 feet. Across the alley and to the rear of the above described lots is lot 23, and next to it is lot 22, and next to it is lot 21. These lots front on Telegraph Road and there is a north-south alley to the rear of these lots. These lots are also 20 feet wide and 110 feet long. Some of these lots were leased during short periods of time to landscape men who displayed flowers and Christmas trees on the property. The three lots fronting on Telegraph Road were sold in 1925 to three purchasers and in 1954 petitioner bought them back from the purchasers. (1) Sale of Lots 21 *171 through 28 On April 9, 1956, petitioner entered into a lease-option agreement with Thomas Gutowski covering lots 21 through 28. The lease called for a period of 5 years at $100 per month, commencing on July 1, 1956. The lease also contained a renewal option for an additional five-year period at $150 per month. The option to purchase provided as follows: 6. The landlord gives to the tenant the right to purchase the demised premises at any time after January 1, 1957, and during and up to June 30, 1961 at a price of Twenty-five Thousand Dollars ($25,000.00), one quarter (1/4) of this amount down and the balance in four (4) equal annual payments including interest at the rate of six (6) percent per annum, and if the tenant exercises his right for an additional five (5) year lease, as herein provided, then the landlord gives the tenant the option to purchase said property at any time during the term of this additional five (5) years at a price of Thirty Thousand Dollars ($30,000.00), one quarter (1/4) of this amount down and the balance in four (4) equal annual payments including interest at the rate of six (6) percent per annum. In 1960, Gutowski exercised his option to purchase *172 the property. A land contract for the purchase of lots 21 through 28 was executed on June 10, 1960. The price was $30,000, of which $3,000 was paid down and the balance of $27,000 was to be paid in monthly installments of $250 with interest at 6 percent. Petitioner's basis in these lots was $9,400 and the expenses of sale amounted to $375. (2) Sale of Lots 61 through 67 Lots 61 to 67, inclusive, are 7 lots facing south on Bonaparte Avenue with lot 61 being at the corner of Bonaparte Avenue on the south and Woodbine Avenue on the west. They are 20 feet wide and extend back to the east-west alley, or 110 feet. These lots were sold to various purchasers in the twenties. Lots 61, 62, 65, 66, and 67 were reacquired by petitioner at tax sales between 1940 and 1945. On July 9, 1962, petitioner granted an option to Standard Federal Savings & Loan Association to acquire lots 61, 62, 65, 66, and 67 of the subdivision. The savings and loan association exercised this option and acquired title by deeds dated October 19, 1962. The selling price was $20,000. Petitioner's basis for the lots was $2,116.75. Petitioner reported the sales of the Pebblebrook Estates lots and lots 21 through *173 28 and lots 61, 62, 65, 66 and 67 in Herndon's Dearford-Telegraph Sub. as installment sales on his tax returns and the gains on these sales as long-term capital gains on Schedule D. Respondent determined that petitioner realized ordinary income in the years 1959 through 1962 from the sales of the Pebblebrook Estates Subdivision and Herndon's Dearford-Telegraph Subdivision lots rather than long-term capital gains as reported by petitioner. Opinion The sole issue is whether the gains realized by petitioner from the sale of certain lots in 1959, 1960, and 1962 should be taxed as ordinary income, as respondent has determined, or as long-term capital gains, as petitioner contends. Section 1221(1) of the Internal Revenue Code of 1954[2] excludes from the definition of a capital asset "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Thus, the resolution of the issue depends on whether the lots petitioner sold were held by him "primarily for sale to customers in the ordinary course of his trade or business." The question is one of fact and numerous cases have emphasized that there is no hard and fast *174 test to be applied in this situation but that each case must turn on its own particular facts. Nelson A. Farry, 13 T.C. 8 (1949); D. L. Phillips. 24 T.C. 435 (1955); Randolph D. Rouse, 39 T.C. 70 (1962). 666 The courts have evolved certain criteria or factors to be considered in determining whether the property was held primarily for sale to customers in the ordinary course of business. Some of them are: The purpose for which the property was acquired and held, the extent of the improvements to the property, the nature and extent of the taxpayer's business, his activity in connection with the sales, the character and degree of supervision and control exercised by the taxpayer over his representatives employed to carry on his activities, whether the property was held primarily for an investment, the frequency and continuity of transactions which are claimed to result in a trade or business, and whether the taxpayer devoted substantial time to the alleged "additional business" so that it amounts to an occupational undertaking. No single *175 factor is decisive; rather it is the totality of the factual pattern which must control the result. Mauldin v. Commissioner, 195 F. 2d 714 (C.A. 10, 1952). affirming 16 T.C. 698 (1951). In Malat v. Riddell, 383 U.S. 569 (1966), the Supreme Court of the United States has commented on the purpose of the statute and construed the word "primarily" as used in section 1221(1) as meaning "of first importance" or "principally". In the cited case the court stated: The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand * * * [citations omitted] and "the realization of appreciation in value accrued over a substantial period of time" on the other * * *. A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), "primarily" means "of first importance" or "principally." We have held that a person can be both an investor and a dealer with respect to his real estate holdings. Nelson A. Farry, supra; Walter R. Crabtree, 20 T.C. 841 (1953); @ D. L. Phillips, supra; *176 Randolph D. Rouse, supra; Real Estate Corporation, Inc., 35 T.C. 610; and Eline Realty Co., 35 T.C. 1. The farm property that later became Pebblebrook Estates Subdivision was acquired in 1932 for the purpose of making a home for petitioner and his wife and using it as a farm. Petitioner in fact lived on the property during the summers and farmed it under share-crop arrangements with resident tenant farmers. Respondent concedes on brief: "It may be said that in this case there is sufficient evidence in the record to find that the petitioner originally purchased this property with the intent of making it into a farm as well as his residence." Respondent goes on to argue that the purpose for which the property was acquired was not the principal purpose for which the property was being held at the time of sale. We think the purpose that was present at the time of acquisition continued until the decision to liquidate the property was made after the illness of petitioner's wife. The subdividing was liquidation activity and the rather infrequent sales of lots do not indicate a business with respect to this property. Over a period of nearly 10 years, *177 from May 1955 through April 1965, petitioner sold only 13 lots and portions of two others in the subdivision. This was not of a frequency or continuity to indicate a business. That petitioner held a real estate broker's license and may have been a real estate dealer with respect to other properties, is a factor to consider but it is not decisive. The activity of petitioner with respect to construction of a gravel road and fence would not tend to indicate a purpose to sell to customers in the ordinary course of business. There were no sidewalks, sewer lines or other utilities installed by or on behalf of petitioner. Petitioner exercised little or no direct control over his representatives in selling this property; he devoted only 200 hours per year to his employment at the Robert Herndon Realty Company. The property was held for over 29 years from the date Della Herndon contracted to purchase the property to the date the first lot was sold and it appreciated in value from a cost in 1932 of $6,213.68 to sales prices in 1959 and 1960 totalling $55,610. These considerations persuade us that petitioner did not hold the Pebblebrook Estates properties primarily for sale to customers in the *178 ordinary course of a trade or business. We hold for petitioner with respect to the sale of the lots in the Pebblebrook Estates Subdivision. Petitioner testified that when he platted Herndon-Telegraph Subdivision in 1924 it was his intention to sell all of the 159 lots in the subdivision to customers in the ordinary course of his real estate business with the exception of lots 24, 25, 26, and 27. He said: "I expected to keep those and to 667 have them for income producing properties. It is a valuable corner. I considered it a valuable corner then, or would become, and it has since become a valuable corner." It was petitioner's testimony that most all of the other lots were sold by 1927 and most of them were sold on contracts, resulting in many defaults and sales to the State for unpaid taxes. Petitioner reacquired many of the lots that had originally been sold in the 1925-1927 period either by buying from the original purchasers or from the State when the State had acquired title for nonpayment of taxes. Lots 21, 22, and 23 were three lots petitioner reacquired in 1954 purchases from the original buyers in the 1925-1927 period. It was petitioner's testimony that he reacquired *179 the above three lots in order to "round out" the corner property he was holding. Petitioner did not state what he meant by "round out". Lots 24, 25, 26, 27, and 28 from a parcel that is nearly square with frontage on Bonaparte Street to the south of almost 100 feet and a frontage on Telegraph Road of 110 feet. Lots 23, 22, and 21 form a parcel about 110 feet by 60 feet lying north of the corner square with an alley between it and the corner square. It does not readily appear that the last three lots, being divided from the other lots by a 20 foot public alley, would be rounding out the corner property in the sense that they formed a more complete corner parcel. At any rate, we are of the opinion petitioner failed to establish that any of the lots 21 through 28 were not held for sale to customers in the ordinary course of petitioner's real estate business. No serious argument can be made that the lots were held for rental income. They were vacant lots which the record shows were rented occasionally for short periods of time. There is no record they were ever rented prior to 1942 and it fairly appears that the rent received in any one year was less than the taxes. For instance, it *180 is stipulated that taxes in the amount of $2,755.35 were paid in 1960 on lots 21 through 28 and this was a year in which the lots were rented to Gutowski for $100 a month. It is true that a dealer in real estate can be a dealer with respect to some of his properties and an investor as to others. We have earlier cited a number of authorities for that proposition but in most of the cited cases the investment property was income-producing. When we have held non-income-producing property was held by a real estate dealer as investment property there has usually been present some other fact that indicated the property was not part of the dealer's stock of unimproved realty. In Eline Realty Co., supra, it was an odd-shaped lot thought to be useless when the subdivision was made but which became valuable when adjacent land was subdivided by another owner. In Charles E. Mieg, 32 T.C. 1314, there was a subdivision of the front side of the mountain where the taxpayer sold lots in the course of his real estate business. The land on the back side of the mountain could not be economically subdivided and we held when parcels of this land were sold it was not to customers *181 in the ordinary course of the taxpayer's business. In Curtis Co., 23 T.C. 740 (1955), reversed on another issue, 232 F. 2d 167, we held property acquired by a real estate dealer for the construction of a shopping center which would be held for rental was acquired for investment purposes and after the shopping center was blocked by zoning restrictions the two sales of the unimproved property were entitled to capital gains treatment. All that we have here is the testimony of petitioner who was an active real estate dealer that at the time of acquiring these lots it was his intent to hold them for rental income-producing purposes and for investment. We have already shown the contention that the property was held for rental is without any support for the unimproved lots could only command an occasional nominal rental. In fact, petitioner's attorney makes no argument that the investment was in rental property. The investment theory is that petitioner intended to hold the lots for a long period of time for a speculated rise in value; that petitioner did hold the lots for approximately 36 years; and they did rise considerably in value. Actually it was petitioner's *182 stated intention to sell all of the lots in his subdivision. His plan of sale was to sell some as quickly as possible and delay the sale of others for a later sale after a hoped for rise in value. This is the plan petitioner carried out but it cannot be said the planned sales of lots that were carried out quickly were to customers in the ordinary course of petitioner's real estate business and the planned sales of other lots in the same subdivision that were carried out later were not to 668 customers in the ordinary course of petitioner's real estate business. This case is much like Margolis v. Commissioner, 337 F. 2d 1001 (1964), affirming in part and reversing in part a Memorandum Opinion of this Court. There the taxpayer was a real estate dealer who contended he held some lots for a long period of time speculating on an increase in value, and when he sold them he was entitled to capital gains treatment. In affirming our holding that the gains on such sales were ordinary income, the court stated: We agree with the Tax Court. Where one is engaged in the business of buying and selling real estate on as broad a basis as was taxpayer, the fact that property was *183 acquired with the intention of holding it for a substantial period of time before sale, is not sufficient to constitute it an investment. n5 If the purpose of the acquisition and holding and the only manner in which benefit was to be realized from the property acquired was ultimate sale at a profit, its acquisition and holding by a dealer such as taxpayer must be considered to have been for sale to customers in the ordinary course of business. [Footnote n5 omitted]. It is true that lots 24 through 28 were held for a long period of time before they were sold. But petitioner testified that after 1928 or 1929 no unsold lots in the subdivision were selling. It is also true that when they were sold, with lots 21, 22, and 23, the selling price was a big gain over cost but we must assume petitioner paid taxes on these vacant lots for over 30 years. When a person is engaged in the business of selling non-income-producing real estate the fact that he plans to delay the sale of some parcels for a long period of time does not mean that when the sale occurs it is anything but a sale to customers in the course of the business the real estate man is conducting. White v. Commissioner, 172 F. 2d 629 *184 (C.A. 5). After considering all of the evidence with respect to these lots 21 through 28, it is our conclusion that they were held primarily for sale to customers in the ordinary course of petitioner's real estate business and not for investment. Between 1940 and 1945 petitioner reacquired lots 61, 62, 65, 66, and 67 in Herndon's-Telegraph Sub. These lots had been sold by petitioner in furtherance of his real estate business in the 1925-1927 period and sold again to the State for nonpayment of taxes. Being a prior owner, petitioner had first chance under Michigan law to buy them back from the State and petitioner did buy them back. Petitioner testified that when he bought these lots he "planned to keep them until the time that we could have sold them at a profit." He also testified that while waiting for this profitable sale the lots were rented occasionally but the rent was only "nominal". This testimony of petitioner that he intended to hold the lots until such time as he could realize a profit on the sale of the lots and the fact that the lots were held for around 20 years before they were sold to the savings and loan association in 1962 constitute the only evidence which petitioner *185 argues supports his right to capital gains treatment as to said sale. There is less evidence here to support the investment theory than was present with respect to the sale of lots 21 through 28. All that we said in concluding the sale of the previously mentioned lots is equally applicable here. It is our conclusion these lots were held primarily for sale to customers in the ordinary course of petitioner's real estate business and not for investment. Various concessions were made by both parties. Decision will be entered under Rule 50. Footnotes
1. The sale of lot 12 resulted in petitioner's receiving $300 in 1959. He then received another $700 in 1960 on the same contract. In 1960, however, petitioner and the purchaser agreed to terminate the contract. The parties are agreed that the $300 received in 1959 is offset by the $300 commission paid by petitioner, so that no taxable income was realized in 1959 in connection with that sale. The parties further agreed that the $700 is includable in petitioner's 1960 gross income. The question of whether this $700 is capital gain or ordinary income is dependent upon our resolution of the principal issue with respect to the sales of lots in Pebblebrook Estates Subdivision.↩
2. Unless otherwise noted, all Code references herein are to the Internal Revenue Code of 1954.↩